## WOLVERINE OIL CO. v. PARKS et al.

No. 9714—Opinion Filed Nov. 4, 1919.

Opinion Corrected and Refiled and Rehearing Denied Nov. 23, 1920.

(Syllabus by the Court.)

**1. Venue — Change — Disqualifications of Judge.**

When it appears that a district judge has acquired an interest in the subject-matter of litigation pending in his court, and that jury commissioners were appointed by said judge after acquiring such interest, and a challenge sustained to the jury panel for the reason that the jurors had been selected by the commissioners so appointed, and it further appearing that the trial judge thereupon issued an open venire directing the sheriff to select a jury from the body of the county to try said cause, the party litigant antagonistic to the interest acquired by the judge was entitled to a change of venue on proper motion therefor, for the reason that he was denied the right to have his cause tried before a jury as prescribed by statute.

**2. Adverse Possession—Hostile Character—Vendor and Purchaser.**

Where the grantor continues in possession of premises after the execution and delivery of a deed, his possession will not be deemed adverse as to his grantee and those deriving title from him. Such possession will be deemed that either of tenant or trustee of the grantee, and nothing short of an explicit disclaimer of such a relation and a notorious assertion of right in himself will be sufficient to change the character of his possession and render champertous a conveyance by his grantee to a third party.

**3. Witnesses—Privileged Communications—Attorney and Client.**

An attorney is not permitted to testify concerning any communication made to him by his client, in that relation, or his advice thereon, without the client's consent.

**4. Evidence—Relevancy—Forgery.**

Plaintiff deraigned title to certain land located in Tulsa county by a deed dated December 18, 1907, from defendants to F. and S., by a deed from F. and S. to P., and from P. to plaintiff. Defendants interposed the plea of forgery as to the deed to F. and S. Held, under the facts in this case, error to permit defendants to testify that a deed dated December 18, 1907, purporting to be signed by defendants conveying lands to F. and S. located in Wagoner county, was also a forgery.

**5. Evidence — Notaries — Impeachment of Certificate.**

The act of a notary public in taking an acknowledgment is of a ministerial nature and not a judicial act. The presumption is in favor of the certificate unless there is contradictory evidence sufficient to overcome

such presumption, and such contradictory evidence may be furnished by the notary, as well as any other witness in possession of the facts. The evidence, however, to impeach a certificate of acknowledgment should be clear, cogent and convincing, and such as produces a conviction amounting to a moral certainty that the certificate is false.

Error from District Court, Tulsa County; N. E. McNeill, Judge.

Action by Wolverine Oil Company against William Parks and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

J. P. O'Meara, Ames, Chambers, Lowe & Richardson, J. H. Hill, J. R. Ramsey, and H. H. Hagan, for plaintiff in error.

C. S. Walker, John D. Wakely, H. B. Martin, A. F. Moss, Davidson & Williams, John Y. Murray, Jr., and J. H. Wilkins, for defendants in error.

PITCHFORD, J. This action was commenced in the district court of Tulsa county on April 1, 1916, by the plaintiff, Wolverine Oil Company, against William Parks, Margaret Parks, and others, for the purpose of recovering the possession of certain lands located in Tulsa county, the same being the land allotted to one Chaney Parks, a Creek citizen, who died before allotment, in 1901, at the age of seven months, leaving as her sole heir, her mother, Margaret Parks, a Creek citizen of one-eighth quantum blood. William Parks the father of the deceased, was a noncitizen. The plaintiff deraigned title: First, by allotment deeds, dated June 24, 1905, to the heirs of Chaney Parks; second, by warranty deed, dated December 18, 1907, from William Parks and Margaret Parks to A. E. Fish and I. O. Stewart; third, by quitclaim deed, dated April 16, 1908, from A. E. Fish and wife and I. O. Stuart and wife to George C. Priestley; fourth, by warranty deed from A. E. Fish and I. O. Stuart to George C. Priestley; fifth, by warranty deed, dated March 2, 1908, from William and Margaret Parks to George C. Priestley; sixth, by warranty deed, dated August 15, 1910, from George C. Priestley to Wolverine Oil Company. In addition to praying for possession of the premises, the plaintiff prayed for decree quieting the title of the plaintiff, Wolverine Oil Company. On June 28th the answers of the defendants, William and Margaret Parks, were filed, in which, among other things, it was alleged that the deeds from Margaret and William Parks to A. E. Fish, I. O. Stuart and George C. Priestley, were forgeries; that the deed from Priestley to the plaintiff was champertous;

and further, that prior to the institution of the action, Margaret and William Parks had conveyed the land in question to their children, Bernie Donaldson, Sallie Donaldson, Fronie Parks, Fannie Parks, Julius Parks, Dora Ellen Parks, Rosetta Parks and Zetta Bean Parks. On July 6, 1916, there was filed a notice signed by M. A. Reasor, R. H. Harmon and W. H. Gray, defendants, to the effect that on July 8, 1916, there would be presented to the district judge of Tulsa county a motion for the appointment of receiver for the property involved in litigation. This motion set out that the movants had an oil and gas lease from Margaret and William Parks, and on July 8, 1916, after counsel for plaintiff and counsel for defendants had agreed that the receivers might be appointed, Judge Conn Linn entered an order appointing W. H. Gray and D. F. Connolly joint receivers with authority to develop the property. On July 10, 1916, Judge Linn continued until the 17th, the motions pending in the case and granted defendants Reasor and Harmon ten days' additional time in which to plead. On August 24, 1916, Judge Linn, the sole district judge of Tulsa county, filed in the case an affidavit which stated that on July 15, 1916, he had acquired an interest in the land involved in the litigation, and therefore, was disqualified to try any issue or make any order in the case, the interest so acquired being a one-sixteenth interest in an oil and gas lease held by the defendants Gray, Harmon and Reasor. On October 7, 1916, W. H. Gray filed answer and cross-petition alleging the execution of an oil and gas lease to William and Margaret Parks, and also the execution of an oil and gas lease from Bernie Donaldson, Sallie Donaldson, Fronie and Fannie Parks, and the execution of a guardianship lease from William Parks, as the guardian of Julius Raymond, Dora Ellen, Rosetta and Zetta B. Parks to the said Gray. Continuing, the answer and cross-petition alleged that if Margaret and William Parks did execute either the deed to Fish and Stuart, or the deed to George C. Priestley, said deeds were without any consideration whatever, and were void for that reason; and that the deed from Priestley to Wolverine Oil Company was champertous and void. On October 10, 1916, the intervener, Conn Linn, filed his verified petition of intervention, answer and cross-petition, setting out the intervener's one-sixteenth interest in the various purported oil and gas leases on the land in controversy; also pleading want of consideration in the deeds from William and Margaret Parks to Stuart, Fish and Priestley; and champerty.

In the meantime, the Hon. N. E. McNeill had been appointed additional district judge for Tulsa and Pawnee counties. When the cause was thereafter called up for trial before the Hon. N. E. McNeill, the plaintiff filed a challenge to, and motion to discharge, the jury panel so summoned. On June 29, 1917, after the motion had been sustained, the Hon. N. E. McNeill, the judge presiding, issued an order for a special venire, said order reciting that the case had been regularly assigned for trial on July 9, 1917; that the plaintiff had heretofore filed its written objection to trying the cause before a jury drawn from the jury box on the ground that Conn Linn had appointed the jury commissioners; that the term of office of the jury commissioners appointed by Judge Linn would not expire until January, 1918, and that the jury box to be filled by jury commissioners on the 2nd day of July, 1917, would be filled by the jury commissioners appointed by the Hon. Conn Linn, and would be subject to the same objection as the jury to which the plaintiff objected. It was ordered that the clerk of the court issue to the sheriff an open venire for fifty men, and that the sheriff summon a jury of fifty men from the body of the county for July 9, 1917, for the purpose of trying the above entitled cause. On July 9, 1917, plaintiff filed a motion for change of venue. This motion alleged that the plaintiff could not procure a fair trial in Tulsa county. Plaintiff also filed its motion to discharge the special jury panel on the grounds that the special jury panel so summoned by order of the court was without notice to, or consent of, the plaintiff, and that the plaintiff was entitled to a jury trial by a jury drawn in the regular and usual manner, as provided by statute. On the same day this motion was filed, namely, July 9th, being the day previously assigned for the trial by the court, the trial was commenced. The various motions were overruled by the court and exceptions noted. In overruling the motion for change of venue, the court said:

"The motion for change of venue at this time will be denied. The court will say that in the empaneling of the jurors, if it should appear that a fair and impartial jury cannot be had on voir dire, I will again consider the matter."

In the examination of the jury on their voir dire, it was shown that the juror, E. K. Moss, was the client of Martin & Moss, who at that time were representing him in a matter pending in court, and who also appeared for defendants; H. O. Miller, one of the jurors, testified that he had had cases in Judge Linn's court, but had no case pending at that time; A. B. Harn, one of the jurors, stated that Davidson & Williams, also attorneys for defendants, represented him as receiver, and that the cause in which he was appointed receiver was then pending in the district court of Tulsa county; the juror Bailey testified that he had done work for Mr. Gray, for Judge Linn and for Mr. Reasor, and that he had made an affidavit in the motion for change of venue to the effect that anyone could get a fair trial in Tulsa county, that he at that time had litigation pending in the district court, and that this cause had been pending in court for four years. After the examination of the jurors on their voir dire, and before they were sworn to try the cause, the plaintiff renewed its motion for change of venue and its challenge to the jury panel, which motion was overruled. Trial resulted in a verdict in favor of the defendants, and plaintiff appeals.

The plaintiff complains of numerous errors, which may be discussed under the following heads:

First: That the court erred in not sustaining the motion for a change of venue.

Second: That the court erred in submitting the issue of champerty to the jury.

Third: That the court committed error in excluding the evidence of O. S. Booth.

Fourth: That the court erred in admitting the evidence of Margaret Parks relative to an affidavit made by her, in permitting William and Margaret Parks to testify relative to a deed purporting to convey lands in Wagoner county, and in permitting William Parks to testify to having written certain letters to the Secretary of the Interior, and to George C. Priestley, and in allowing Margaret Parks to testify as to the most money she ever had.

Fifth: That the court erred in admitting the evidence of C. L. Torr, the notary, who took the acknowledgment of defendants William and Margaret Parks to the deed to A. E. Fish and I. O. Stuart to the effect that his certificate was false.

Sixth: That the court erred in instructions given to the jury and in the refusal to give instructions requested by the plaintiff.

We shall try to discuss the assignments in the order named:

First. Was the plaintiff entitled to a change of venue under the facts disclosed by the record? After this cause was filed in the district court of Tulsa county, the defendant,

Conn Linn, who at that time was the sole judge in the district comprising Tulsa county, secured an interest in the lands in controversy. It is true he certified his disqualification. Thereupon, the Hon. R. W. Higgins was assigned to try the cause. Upon the trial before Judge Higgins, a verdict was returned for the defendants. This verdict was set aside and a new trial granted. In the meantime the legislature had created an additional judge for the district comprising Tulsa county, and the Hon. N. E. McNeill had been appointed as additional judge. The cause came on before him for trial and resulted in a mis-trial. When the cause was next called for trial, plaintiff filed a challenge to the jury on the grounds that the jury commissioners, who had selected the jury for that term of court, had been appointed by Judge Linn after he had secured an interest in the litigation, and after he was a party to the cause, and that the jurors summoned for that term of court, selected by the jury commissioners so appointed, were disqualified as jurors in a cause in which Judge Linn was interested. It seems that this motion was confessed, or at least the defendants consented that the motion be sustained. Thereupon, the cause was set for the 9th of July. It appears that the trial judge, the Hon. N. E. McNeill, anticipating that the same objection would be made to any jury selected by the commissioners and drawn from the jury box, issued an open venire directing the sheriff to select from the body of the county the names of fifty qualified jurors to appear on the 9th of July, 1917, from which a jury was to be selected to try this particular cause. When the case was next called for trial, the plaintiff objected to the panel as selected, which challenge was overruled. A motion for change of venue was then filed. In selecting the jury, as we have seen, it developed that some of the jurors so selected were represented by counsel for the defendant in cases at that time pending, and in addition to this, we find that one of the jurors was a receiver, represented by counsel for defendants, and that Judge Linn himself had appointed this juror as receiver. The question now presented is: Did the plaintiff have his cause tried to a jury who were fair, unprejudiced, and unbiased, and a jury such as contemplated by the laws of Oklahoma?

Our statutes specifically point out how a jury is to be selected. In appointing the jury commissioners, the judge must ascertain that they are not interested in any cause, civil or criminal, pending in any court of the state. These commissioners so appointed are required to meet and subscribe to an oath, and the jury list shall be made up of names of persons from the various municipal townships in the county, in proportion as nearly as practicable, to the voting strength of such township. It would seem rather inconsistent, to say the least, that a citizen would be disqualified to act as a commissioner because he might be interested in some cause pending, yet the same objection would not apply to a judge making the appointment, when the judge was himself a party litigant in the cause to be tried by the jury so selected, and had acquired that interest by purchase after the cause had been filed in his court. As to whether the challenge to the panel should have been sustained, we are not called upon to decide, but ordinarily, when an objection is made and the court ascertains that a jury cannot be selected in the way provided by statute, then the common law would apply. However, we are firmly convinced that no litigant could ever be made to feel that he had received a fair and impartial trial in any court where the judge, who had for several years presided in the court of that county wherein the cause was pending, had secured an interest in the litigation, and his acts made it practically impossible for a litigant to have a jury selected as provided by statute. And especially in the case at bar, when the jurors were summoned under a special venire, and several of the jurors selected to try the cause were interested in litigation pending in the court of which the defendant Linn was judge.

As was well said by Justice Dunn in the case of Garvin v. Harrell, 27 Okla. 373:

"A lawsuit is, at its best, a misfortune, yet, when a citizen feels that his rights have been invaded and other means have failed, it is the only method prescribed by the law of the land for the vindication thereof and the administration of a remedy. He is denied the privilege of seeking and forcing redress by his own strong arm and compelled to resort to the established tribunals for remedy. A resort to law is usually at the unsuccessful conclusion of all other efforts for adjustment, and all parties confidently appeal to the courts with the abiding conviction that they are right and that justice will be administered unpolluted and exact. It is essential to the well being of society that this confidence be encouraged and sustained, and that the faith of the people in the courts be not shattered. In order that this may be so, the jury, the trial, and all the proceedings connected with them should not only be free of wrongdoing, but their administration should be so untainted, free, clear and above board, that there will be no room for suspicion that the conclusion reached was influenced by

other matters than an unbiased considera-
tion of the law and the evidence, and this
considered and applied by an honest, up-
right judge and jury. The fair and im-
partial jury, duly empaneled, sworn and
charged to try the cause and true deliver-
ance make, had been the bulwark of the
best system yet devised by man for the de-
termination of controverted questions of
fact, and our people are content and feel
secure in their persons and property be-
cause of their abiding confidence in its in-
tegrity. When the unfortunate parties, then,
unable to settle their own differences, leave
them to the judgment of a court and jury,
the result should come to them both un-
tainted by a breath of suspicion that aught
else than the law of the land and their evi-
dence was even remotely responsible for the
verdict."

We do not believe, nor is there the least
evidence to excite suspicion, that anything
was done by Judge Linn to corruptly influ-
ence the jury in the case at bar, and we
may absolve the jurors of any suspicion that
their verdict was responsive to aught else
than the law and the evidence as delivered
by the court and the witnesses, but we can
understand how the plaintiff cannot enter-
tain this view, and he has a right to have
the facts of his case passed upon by a jury
upon which the possibility of undue influence
has not been exerted. When we consider
the fact that Judge Linn acquired an in-
terest in litigation pending in this court,
the jury being selected by jury commission-
ers appointed by him after acquiring that
interest, and a challenge being made to the
panel for this reason and the challenge sus-
tained; and when it further appears that
several of the jurors selected by the open
venire had cases pending in the court over
which Judge Linn presided, and especially
when it appears that one of the jurors was
a receiver appointed by him and to whom
he was required to report, and that some
of the jurors sworn to try the cause had
cases then pending in that court and were
represented by counsel for the opposite side,
under these circumstances we unhesitatingly
say that the plaintiff was entitled to a
change of venue. From time immemorial
the public has regarded the judges of the
district courts as possessing all the attri-
butes of honesty, truth and integrity, which
every judge should possess, and a desire
upon their part at all times of being fair
and disposed to administer exact justice in
the courts over which they preside. While
there are exceptions to this rule, be it said,
however, to the credit of the judiciary, the
great majority of the people have always
regarded judges as possessing preeminently
these qualifications; therefore, where a judge

descends from his exalted position and be-
comes an active party litigant in the trial
of a cause before jurors having cases in his
court, and before whom the cases of these
jurors are liable to be tried, and goes upon
the witness stand to testify in the case, his
evidence carries with it the reflected credit
of his position as judge, and the average
juror so circumstanced, without being con-
scious of the fact, is, to some extent, in-
fluenced thereby. We are of the opinion that
where a judge is a party in any case in the
court over which he presides, there should
never be anything occurring to make the
opposite party feel as if he had not had a
fair trial. The rule is well settled that the
question of change of venue is largely within
the discretion of the court, and we would
be loath to interfere with that discretion
unless it is clearly made to appear that it
has been abused. But in the case at bar,
we are convinced that, under all the showing
made, the plaintiff was entitled to a change
of venue.

However, we do not mean to indicate that
a change of venue should be granted if the
conditions herein discussed shall have ceased
to exist when the cause is again considered
by the trial court.

Second. Was the court in error in sub-
mitting to the jury the question of cham-
perty? The defendant, Margaret Parks, re-
mained in possession of the premises after
she had executed deeds to Fish, Stuart, and
Priestley. As we understand the law, the
fact of the grantor remaining in possession
after the execution of the deed is not within
itself conclusive evidence of adverse posses-
sion. In the case of Flesher v. Callahan,
32 Okla. 283, 122 Pac. 489, in the syllabus,
the court states:

"By the execution and delivery of a deed
in general terms, the entire legal interest
in the premises vests in the grantee, and if
the grantor continues in possession after-
ward, his possession will be that either of
tenant or trustee of the grantee. He will
be regarded as holding the premises in sub-
serviency to the grantee and nothing short
of an explicit disclaimer of such a relation
and a notorious assertion of right in him-
self will be sufficient to change the character
of his possession. In such case the grantor
is not deemed, in law, to have adverse pos-
session against his grantee, or those deriv-
ing title from him."

In F. B. Collins Inv. Co. et al. v. Waide,
70 Oklahoma, 173 Pac. 835, it is said:

"Knowledge by a purchaser of land that
the grantor under whom the vendor claims
is in possession thereof, is not such knowl-

edge as to put the purchaser upon inquiry as to the title of such grantor."

To the same effect see Riddle et al. v. Keechi Oil & Gas Co., 74 Oklahoma, 176 Pac. 737; Rowsey v. Jameson, 46 Okla. 780, 149 Pac. 880.

There is no evidence that Margaret Parks at any time after the date of the deeds to Fish, Stuart and Priestley, explicitly disclaimed, or that she asserted any rights to, the property more than the fact that she was in possession of the same. So far as the record discloses, the contention of Margaret Parks was that she knew nothing of these deeds. Her claim was that they were forgeries. It is true that the evidence was introduced to the effect that on August 14, 1909, William Parks wrote George C. Priestley a letter in which he inquired:

"I want to know what reason did you have to pay the taxes on my land? I have not given you permission to pay my debts."

Whose land? It is not stated that it is Margaret Parks' land, but William Parks says, "My land." On the 27th of August, of the same year, Priestley answered this letter and explained to William Parks why he was paying taxes on the land. This answer appears to have silenced William. The evidence shows that William Parks and Margaret Parks were separated long before 1909. There is nothing to show that he at that time was acting as her agent; in fact, the evidence discloses that at that time William Parks deemed himself to be the owner of the land.

The reasons for the enactment of the champerty statute were to prevent litigation and the purchase of doubtful claims by strangers to them, and if the owner is not disposed to attempt the enforcement of a doubtful claim, public policy requires that he should not be allowed to transfer it to another party and thereby encourage strife and litigation. But under the evidence adduced in the trial of this cause, we are unable to see wherein the plaintiff could be accused of champerty in purchasing the land from Priestley. Up until that time there had been no act on the part of Margaret Parks inconsistent with the Priestley deed further than her possession. In the case of Graydon v. Hurd, 5 C. C. A. 258, 55 Fed. 724, it was held that while the grantor was holding over, and this holding was open, notorious, visible and known generally to the people in the vicinity, it was not sufficient to put the grantee on notice that her possession was hostile or adverse. The affidavit of Margaret Parks introduced by defendants over objection of the plaintiff bears date 1913, long after plaintiff had acquired title, and could not relate back to the date of the deed from Priestley to plaintiff, as tending to show that at that time her possession was adverse to the title claimed by Priestley. We do not wish to be understood, however, as holding that the possession by the grantor after the execution of a deed estops the grantor from setting up any defense to avoid the deed when the same was secured by fraud, deceit or misrepresentation. Shaffer v. Turner, 43 Okla. 744, 144 Pac. 366; Adams v. White, 40 Okla. 535, 139 Pac. 514. We are of the opinion, therefore, that there is no evidence in the record which justified the court in submitting the question of champerty to the jury.

The third assignment of error relates to the action of the court in excluding the evidence of O. S. Booth. The record discloses that one Shallenberger had an oil and gas mining lease on the land in controversy; that Margaret and William Parks had instituted, or were about to institute, an action against the Wolverine Oil Co., I. O. Stuart and George C. Priestley, to clear her title to the lands in controversy. Her attorney in the matter was Mr. Thurman of the Tulsa bar. Mr. Booth, who was also an attorney of the Tulsa bar, had been employed by Mr. Shallenberger to assist the attorney of Margaret and William Parks. It appears that Mr. Thurman and Mr. Booth were acting in conjunction, and that Booth, though employed by Shallenberger and paid by him, became associate counsel with Thurman in representing Margaret and William Parks. Plaintiff sought to prove by Mr. Booth what was said by William Parks in a conversation between Thurman, Booth and Parks in the presence of Lincoln Parks, the brother, and one or two other parties whose names were not given. Under paragraph 4, sec. 5050, Rev. Laws 1910, it is provided that an attorney, concerning any communications made to him by his client, in that relation, or his advice thereon, shall be incompetent to testify without the client's consent. It will not do to say that because Mr. Booth had been employed and was paid by Mr. Shallenberger, he was not also representing Margaret Parks. Any communication made under the circumstances would be entitled to the same protection as if it had been sought to make this proof by Mr. Thurman himself. It is not shown who the other parties present were, except Lincoln Parks. So far as disclosed by the record, it might have been some member of the family. In other words, in order to make this evidence admissible, it would be incumbent upon the plaintiff to show that the

communication was not of a confidential nature, and it would be incumbent upon the plaintiff to show that some one, a stranger to the suit, heard the conversation, or was so placed or circumstanced that it was very likely that some one not interested in the case did hear it.

In the case of Evans v. State, 5 Okla. Cr. 643, 115 Pac. 810, Mr. Baker was a practicing attorney of Watonga, Okla. J. C. Evans was jointly indicted with P. F. Tyler and W. S. Wichard for the crime of forgery. The instrument alleged to have been forged was a deed from J. M. Rossiter and Julia Rossiter, his wife, and J. O. Rossiter to Elwood Rossiter. It appears that Mr. Baker was acquainted with the Rossiters. Two of the Rossiter boys and their father went to the office of Mr. Baker and consulted him concerning the criminal case against Evans, Tyler and Wishard, for forging the deed referred to. About a week after the visit just referred to, the father and his two sons again visited Mr. Baker's office. At the trial of the case against Evans, Baker was placed on the witness stand and asked with reference to the visits of the Rossiters to him. He was asked among others this question on direct examination:

"Did either one of these there in your presence and hearing make the statement in the presence of the others that Elwood Rossiter had signed the names of both the men to that deed, that is, the name of J. M. Rossiter and J. C. Rossiter?"

The lower court held that the conversations that took place with Baker were privileged, and the Court of Appeals sustained that position. We are of the opinion that no error was committed in sustaining the objection to this evidence in the instant case.

The fourth assignment alleges error on the part of the court in admitting the evidence of William and Margaret Parks to the effect that a deed purporting to have been executed on December 18, 1907, to Fish and Stuart, conveying to them Margaret Parks' allotment in Wagoner county, was also a forgery. There is nothing in the entire record disclosing any claim by plaintiff under the deed to the Wagoner county land. The validity or invalidity of that deed was not an issue in the case at bar. By the introduction of this evidence, an issue was injected into the instant case entirely distinct and foreign. If Fish and Stuart had been on trial for the forgery of the deed to the lands in controversy in the present action, we are not prepared to say the evidence would not have been competent

against them on the question of intent. But if it should be that this evidence was admissible, it could in no manner affect the deed from Margaret and William Parks to George C. Priestley. When the evidence was admitted that the deed to the Wagoner lands was a forgery, and without any prior notice to plaintiff, and that this attempt would be made and no preparation on the part of plaintiff to meet this issue, the jury would thereby be unconsciously influenced in considering the question as to whether the deed to Priestley was also a forgery. We are of the opinion that this evidence was clearly inadmissible. Kingsbury v. Waco State Bank (Tex. Civ. App.) 70 S. W. 551; Davis v. Vories (Mo.) 42 S. W. 707; Reed Groc. Co. v. Miller, 36 Okla. 134, 128 Pac. 271; Jones v. Okla. Planing Mill & Mfg. Co., 47 Okla. 477, 147 Pac. 999.

Plaintiff complains that error was committed in allowing evidence of William Parks to the effect that he had written the Secretary of the Interior about the fact that George C. Priestley claimed to own the land in controversy, and that the court erred in admitting into evidence the statement of Margaret Parks that the most money she ever had at any one time was $100, which she received during the summer of 1916; and further, that the court erred in admitting the evidence of William Parks to the effect that in 1909 he had written to George C. Priestley a letter inquiring why he was paying taxes on his land. We are not prepared to say that error was committed in allowing this evidence to go before the jury. Had no effort been made to pay the taxes by Margaret or William Parks, this fact would have been offered in evidence by the plaintiff. To illustrate: If year after year the plaintiff had been paying taxes on these lands, and the defendants at no time had sought to pay the same, this would have been a circumstance to go before the jury, and if the plaintiff would have been permitted to introduce evidence of this nature, we cannot see wherein the same rights would not be permitted the defendants. It is not in the nature of self-serving declaration or acts, but it is such evidence as is permitted to go before the jury for whatever it is worth, and the jury is to decide as to its probative effect. Now was error committed in permitting Margaret Parks to testify that the most money she ever had at any one time was $100, which she received during the summer of 1916. Plaintiff had sought to prove that she had received at least $100 from Fish and Stuart. This evidence was competent for the purpose

of controverting the evidence offered by the plaintiff.

Fifth. The plaintiff complains of error in admitting the evidence of C. L. Torr, the notary who took the acknowledgment of defendants, Wm. and Margaret Parks, to the deed executed to Fish and Stuart, to the effect that his certificate was false. While there are some authorities holding that a notary should not be allowed to give testimony impeaching his certificate, giving as a reason therefor that the certificate is made at the time of the acknowledgment and is the solemn declaration of the officer in his official capacity under his hand and seal as the truth and accuracy of the statements it contains, and is much more likely to be true and correct than the memory of the notary in years afterwards, this question has been set at rest in Oklahoma in Effenberger v. Durant et al., 57 Okla. 445, 156 Pac. 212. Judge Rittenhouse, Commissioner, delivering the opinion of the court, said:

"An investigation of this subject discloses the fact that the great weight of authority supports the view that the act of the officer in taking an acknowledgment is of a ministerial nature and not a judicial act. The presumption is in favor of the certificate, unless there is contradictory evidence reasonably tending to overcome such presumption; and such contradictory evidence may be furnished by the notary public as well as any other witness in possession of the facts."

To the same effect see McCurley v. Pitner et al., 65 Ill. App. 17; Mays v. Pryce et al., 95 Mo. 603, 8 S. W. 731.

Sixth. Plaintiff complains of certain instructions given by the court, and of the refusal to give certain instructions requested by the plaintiff. We have carefully examined the instructions given, as well as those refused, and conclude there was no error committed by the trial court in this particular further than as stated above, wherein we hold the court was in error in giving the instruction on the question of champerty. In addition to this, we are of the opinion that instructions as given by the court, numbered respectively 8 and 9, erroneously advised the jury as to the kind or degree of proof necessary in order successfully to impeach a notarial certificate in due form. In these instructions the court tells the jury in effect that the presumption of regularity may be overcome "when the evidence is clear, cogent and convincing, and satisfies your mind that the recitals and statements made in the notary's certificate are false and untrue." This falls short of the measure or standard of proof required. Not only must the evidence be "clear, cogent and convincing," but under

the holding of this court, it must go farther and must be "such as to produce a conviction amounting to a moral certainty that the certificate is false." In the case of Dyal v. Norton, 47 Okla. 794, 150 Pac. 703, it is said:

"The evidence to impeach a certificate of acknowledgment should be clear, cogent and convincing, and such as produces a conviction amounting to a moral certainty that the certificate is false."

We therefore conclude that the judgment of the trial court should be reversed and the cause remanded for further proceedings in accordance with this opinion, and it is so ordered.

RAINEY, HARRISON, JOHNSON, and BAILEY, JJ., concur. OWEN, C. J., and McNEILL, and HIGGINS JJ., disqualified, and KANE, J., not participating.