# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 10, 2000 Session

## ESTATE OF JOHN E. ACUFF, SR., ET AL. v. BRENDA O'LINGER

**Appeal from the Chancery Court for Marion County**
No. 6064     Jeffrey Stewart, Chancellor

**No. M1999-00680-COA-R3-CV - Filed April 11, 2001**

The singular dispositive question on this appeal is whether or not two deeds, purportedly executed by the late John E. Acuff, Sr., conveying certain property to Brenda O'Linger, bear the forged signature of John E. Acuff, Sr. An advisory chancery jury, acting under "preponderance of the evidence" instructions, held that the signatures were forged thereby voiding the two deeds. The chancellor adopted, without comment, the findings of the advisory jury and entered judgment for the plaintiffs voiding the two deeds. Defendant appeals and upon consideration of the record we reverse the chancellor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Dismissed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and PATRICIA J. COTTRELL, J., joined.

John W. Cleveland, Sweetwater, Tennessee and Marshall A. Raines, Jr., Jasper, Tennessee, for the appellant, Brenda O'Linger.

Bob E. Lype, Chattanooga, Tennessee, for the appellees, Estate of John E. Acuff, Sr., by and through its Co-administrators, and John E. Acuff, Jr., Ella Joy Engdahl, Royce Basil Acuff, and Joyce Faye Burkhalter, Individually.

## OPINION

John E. Acuff, Sr., late of Marion County, Tennessee, married Jewel Acuff by whom he had four children prior to their divorce in 1970. These children, John E. Acuff, Jr., Ella Joy Engdhal, Royce Basil Acuff and Joyce Faye Burkhalter, were appointed co-administrators of the Estate of John E. Acuff, Sr. following his death intestate on November 10, 1996. These four children, individually and as co-administrators of his estate, are the plaintiffs in this case.

In 1972, following the divorce of John E. Acuff, Sr. and Jewel Acuff, a long-term relationship started between John E. Acuff, Sr. and Doris Brown. They were never married but

cohabited as mates from 1972 until Mr. Acuff died, holding themselves out in the community as husband and wife and also as business partners. Mr. Acuff and Ms. Brown were very successful business partners.

Mr. Acuff was an astute businessman and accumulated extensive real property holdings. In 1995, he began both a business and a personal relationship with Brenda O'Linger. Mr. Acuff started a mobile home sales lot in Jasper, Tennessee in 1995, but almost immediately thereafter leased this facility to Brenda O'Linger for $3500 per month. The business was quite successful and in August and September of 1996, two deeds were purportedly executed by John E. Acuff, Sr. conveying to Brenda O'Linger the mobile home sales lot, including adjacent property and property referred to as the "railroad property." Before these deeds were recorded, Mr. Acuff suffered a stroke and died on November 10, 1996. Ms. O'Linger then recorded the deeds and the plaintiffs, individually and as co-administrators of his estate, brought suit to set aside the two deeds asserting that the purported signatures of John E. Acuff thereon were forged.

It is easy enough in this case to identify the controlling issue. The two deeds are either forged or they are not forged. That having been said the complications begin. First of all we must determine whether the burden of proof to be carried by the plaintiffs on the issue is a simple "preponderance of the evidence" burden or a "clear, cogent and convincing evidence" standard.

The former statutory definition of forgery was "[F]orgery is the fraudulent making or alteration of any writing to the prejudice of another's rights." *State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984) (citing T.C.A. § 39-3-802 (repealed)). A fraudulent intent is essential. Tenn. Code Ann. § 39-14-114; *see also Brenner v. State*, 217 Tenn. 427, 398 S.W.2d 252 (1965).

A line of cases in Tennessee assert that fraud must be established under a "clear, cogent and convincing evidence" standard. *Jones v. Seal*, 56 Tenn. App. 593, 409 S.W.2d 382 (Tenn. Ct. App. 1966); *Pipkin v. Lentz*, 49 Tenn. App. 206, 354 S.W.2d 87 (Tenn. Ct. App. 1961); *Anderson v. Nichols*, 39 Tenn. App. 503, 286 S.W.2d 96 (Tenn. Ct. App. 1955); *Bevins v. Livesay*, 32 Tenn. App. 1, 221 S.W.2d 106 (Tenn. Ct. App. 1949); *Williams v. Spinks*, 7 Tenn. App. 488 (Tenn. Ct. App. 1928); *White v. Bettis*, 56 Tenn. 645 (Tenn. 1872).

Another line of cases in Tennessee assert the rule that fraud is established under a simple "preponderance of the evidence" standard. *Dale v. Thomas H. Temple Co.*, 186 Tenn. 69, 208 S.W.2d 344 (Tenn. 1948); *James v. Joseph*, 156 Tenn. 417, 1 S.W.2d 1017 (Tenn. 1928); *Hendrix v. Insurance Co. of North America*, 675 S.W.2d 476 (Tenn. Ct. App. 1984);

In *Gentry v. Hill*, (no docket no.) 1985 Tenn. App. LEXIS 3180 (Tenn. Ct. App. Sept. 25, 1985), Judge Houston Goddard for the Eastern Section of the Court of Appeals, after an exhaustive review of Tennessee case law, correctly concluded that "about the only thing that is clear is that the rule to be applied is unclear."

The burden of proof issue is clearly presented by this appeal. The Chancellor impaneled an advisory jury and on the issue of fraud charged the jury under a simple "preponderance of the evidence" standard. This charge was over the objection of the defendant/appellant who specially requested a jury instruction under the "clear, cogent and convincing evidence" standard. The special request was denied and the advisory jury returned its verdict for the plaintiffs under a "preponderance of the evidence" charge. The final judgment of the Chancellor provided in part:

> The trial was bifurcated by agreement of counsel and with the court's approval, such that the issues tried from January 11-14, 1999 were limited to the validity of the two deeds at issue (as described below), with issues related to the plaintiff's claim for any back rent owing and the defendant's claims for offsets against any such back rent owing being reserved for future determination, if necessary. Following the close of the plaintiff's proof in the bifurcated proceedings, the defendant moved the court for a directed verdict dismissing all claims against her, which the court denied. After hearing the remainder of the proof, on January 14, 1999 the advisory jury returned its advisory verdict in the form of answers to special interrogatories. The advisory jury's verdict is attached hereto as exhibit one. Based upon the proof at trial and taking into account the entire record in this cause, the court adopts the advisory jury's unanimous answers to the special interrogatories as the specific findings of the court, which are adopted and incorporated herein by specific reference.

The final order declared the two deeds in issue to be void.

It is clear that by charging the advisory jury on a "preponderance of the evidence" standard and then accepting their verdict as the findings of fact by the court, the case was decided by the Chancellor under a "preponderance of the evidence" standard.

In *Gentry v. Hill*, the court was determining a misrepresentation and fraudulent misrepresentation case. Said the court:

> When the determination of the Trial Judge turns on credibility of witnesses appellate courts recognize that he is in the best position to judge and his judgment is entitled to great weight. This is true because he alone had the opportunity to observe the appearance and demeanor of the witnesses while testifying. *Royal Insurance Co. v. Alliance Ins. Co.*, 690 S.W.2d 541 (Tenn.Ct. App. 1985).

> In light of this rule and Rule 13 of the Tennessee Rules of Appellate Procedure, which brings this case to us with the presumption that the findings of fact of the Trial Court are correct, we conclude that the evidence does not preponderate against his finding.

> The Defendants insist, however, that under Tennessee law a finding of fraud must be by clear and convincing evidence. As to this point we are frank to concede

that the evidence in our view does not exceed a bare preponderance, and if the rule is as insisted by the Defendants they are entitled to a judgment in their favor.

Recently in *Jarmakowicz v. Suddarth*, No. M1998-00920-COA-R3-CV, 2001 WL 196982 (Tenn. Ct. App. Feb. 28, 2001), an action involving a claim for damages for the tort of fraud and deceit, this Court applied a "preponderance of the evidence" standard. In doing so the Court distinguished between such actions and those actions such as are involved at bar where one seeks to set aside or reform a written instrument. Said the Court:

> [W]e believe the claimant asserting the tort of fraud and deceit in an action for damages must only meet a preponderance of the evidence burden of proof. We agree with this court's holding in *Gentry v. Hill*, (no docket no.) 1985 Tenn. App. LEXIS 3180 at *6-11 (Tenn. Ct. App. Sept. 25, 1985) (no Tenn.R.App.P. 11 application filed), where, after reviewing various holdings on the applicable burden of proof and determining "about the only thing that is clear is that the rule to be applied is unclear," this court concluded "the preponderance of the evidence rule is the better one and will better serve the interests of justice." *Id.* at *8.

> A number of cases finding that fraud must be proved by clear and convincing evidence involve attempts to set aside or reform a written instrument. *See, e.g., Dickey v. Nichols*, No. 01-A-01-9007-CH00260, 1991 WL 169618 at *5 (Tenn. Ct. App. Sept. 4, 1991) (no Tenn.R.App.P. 11 application filed) ("In order to justify reformation, the evidence of mistake or fraud must be clear and convincing"); *Russell v. Zanone*, 55 Tenn. App. 690, 704, 404 S.W.2d 539, 545 (Tenn. Ct. App. 1966) (In a suit seeking to set aside a promissory note and enjoin enforcement of a judgment based on that note, the court reviewed the various descriptions of the applicable standard, including "clear and satisfactory" and "clear, cogent and convincing").[5] As this court has stated, **such cases are not applicable to a tort cause of action for fraud and deceit where rescission of a document or instrument is not involved.** *Cavallo v. University of Tennessee, Memphis*, No. 01-A-01-9206-CH00210, 1992 WL 312620 at *4 (Tenn. Ct. App. Oct. 30, 1992) (no Tenn.R.App.P. 11 application filed).

> [5]*See also Jones v. Seal,* 409 S.W.2d 382 (Tenn. Ct. App. 1966) (an action to set aside an executed deed on the grounds of fraud); *Williams v. Spinks*, 7 Tenn. App. 488 (1928) (an action to set aside a lease executed by the parties on the grounds of fraud); and *A.J. White v. Bettis & Capps*, 56 Tenn. 645 (1872) ("fuller proof" needed than in the ordinary civil case to set aside a deed on fraudulent conveyance grounds). We do not disagree that clear and convincing evidence is required in such situations.

*Jarmakowicz v. Suddarth*, No. M1998-00920-COA-R3-CV, 2001 WL 196982 at * 9-10 (Tenn. Ct. App. Feb. 28, 2001) (footnotes omitted) (emphasis added).

Two reasons in the present case impel the application of a "clear and convincing evidence" standard.

(1) The plaintiff seeks to set aside what appear to be two signed deeds purporting to convey this property from John E. Acuff to Brenda O'Linger, and
(2) Both of the deeds are acknowledged in proper form by a notary public.

It is well settled that to set aside a deed on the grounds of fraud the proof thereof must be clear, cogent and convincing. *Myers v. Myers*, 891 S.W.2d 216 (Tenn. Ct. App. 1994); *Pugh v. Burton*, 25 Tenn. App. 614, 166 S.W.2d 624 (Tenn. Ct. App. 1942); *Anderson v. Howard*, 18 Tenn. App. 169, 74 S.W.2d 387 (Tenn. Ct. App. 1934).

As a general rule, clear and convincing evidence is required to overcome a certificate of acknowledgment, a bare preponderance of the evidence being insufficient. 1A C.J.S., Acknowledgments § 102.

There is a long standing division of judicial authority among the states as to whether a notary public acknowledging a written instrument is performing a ministerial or a judicial act. *Cooper v. Hamilton Perpetual Bldg. & Loan Ass'n*, 97 Tenn. 285, 37 S.W. 12 (Tenn. 1896). Older cases in Tennessee made it clear that the notary public was performing a judicial act.

"The notary public taking the acknowledgment acts judicially and the duty is imposed upon him by law of ascertaining the truth of the matters about which he is to certify." *Kyle v. Kyle*, 74 S.W.2d 1065, 1067 (Tenn. Ct. App. 1934). Under this rule, one assailing an acknowledged deed had the burden "to show that the deed was a forgery and to avoid the certificate of acknowledgment. The presumption is in favor of the validity and regularity of a written instrument, and the person asserting its invalidity has the burden of proving his allegations by clear and satisfactory evidence." *Id.*

Speaking in the context of the prior statutory rule requiring the acknowledgment of a married woman's deed to be taken separate and apart from the husband, this Court observed:

> The probate of a married woman's deed by an officer authorized to take such acknowledgments is regarded as the solemn act of a sworn officer of the law, quasi judicial in its nature, and should be given very great weight as to every statement contained in the officer's certificate, when the certificate is written in the form required by law. It should not be overturned except upon the clearest and most convincing evidence, and the unsupported testimony of the husband and wife will not be permitted to overturn the statements of the certificate as to the fact that the privy examination of the wife was properly taken. *Thompson v. Southern B. & L. Association* (Tenn. Ch. App.) 37 S.W. 704, affirmed by Supreme Court; *Shell v. Holston National B. & L. Association* (Tenn. Ch. App.) 52 S.W. 909, 911, affirmed by Supreme Court; *Grotenkemper v. Carver*, 9 Lea, 280. And a fortiori this is true

where the certificate is supported by the testimony of the probating officer at the trial, as in the instant case.

*Erwin Nat. Bank v. Riddle*, 18 Tenn. App. 561, 578, 79 S.W.2d 1032, 1042-43 (Tenn. Ct. App. 1934).

Speaking once again of the acknowledgment of a married woman's deed under the old statute in Tennessee, it was said:

Parol evidence, it is conceded, may be received for the purpose of proving forgery or fraud, or collusion between the husband and the notary or other officer taking the wife's acknowledgment, in consequence of which it was falsely certified. *Barnet v. Barnet*, 16 Am. Dec. 516; *Louden v. Blythe*, 55 Am. Dec. 527, 530. The question of how far parol evidence can be admitted to impeach the acknowledgment of a deed is a very important one. An examination of the cases will disclose the fact that in all of them the law looks upon the acts of the official taking the acknowledgments as the completest and most satisfactory evidence of the facts recorded by them, and especially is this so in courts holding that the act of the officer taking the acknowledgment is a judicial act. In this class of cases it is said that the officer taking the acknowledgment acts judicially, and that the duty is imposed upon him by law of ascertaining the truth of the matters about which he is to certify. *Lickmon v. Harding*, 65 Ill. 505; Whart. Ev. § 1052. The result of the principle stated is that when the certificate of acknowledgment is on its face regular and complete, parol evidence will not be received to contradict it except to show that there was in fact no acknowledgment, or that the alleged acknowledgment was procured by fraud, collusion, or imposition, which amounts in effect to showing that there was no acknowledgment. Fraud, collusion, or imposition, as stated, may be shown to avoid the certificate as to the immediate parties to the deed. *Montgomery v. Hobson, Meigs,* 437; *Smith v. Ward*, 1 Am. Dec. 80, note, and cases cited. All the cases, we believe hold that the proof to impeach the certificate must be full, convincing, and conclusive.

*Kennedy v. Security Bldg. & Sav. Ass'n*, 57 S.W. 388, 393 (Tenn. Ch. App. 1900).

In reviewing the law in sister jurisdictions, it appears to be of little significance whether the notary public taking an acknowledgment acts in a judicial or in a ministerial capacity. As example, the Supreme Court of Oklahoma addressed the issue in a case where the plaintiffs sought to impeach the acknowledgment of a notary public. In sustaining a trial court judgment for the defendants, the Court held:

The rule applicable in cases where it is sought to impeach a certificate of acknowledgment is stated in *Dyal v. Norton*, 47 Okl. 794, 150 P. 703, in paragraph 4 of the syllabus thereof, as follows: "The evidence to impeach a certificate of

acknowledgment should be clear, cogent, and convincing, and such as produces a conviction amounting to a moral certainty that the certificate is false."

In *Wolverine Oil Co. v. Parks et al.*, 79 Okl. 318, 193 P. 624, we held: "The act of a notary public in taking an acknowledgment is of a ministerial nature, and not a judicial act. The presumption is in favor of the certificate, unless there is contradictory evidence sufficient to overcome such presumption, and such contradictory evidence may be furnished by the notary, as well as any other witness in possession of the facts. The evidence, however, to impeach a certificate of acknowledgment should be clear, cogent, and convincing, and such as produces a conviction amounting to a moral certainty that the certificate is false."

These rules have been applied in *Stidham v. Moore*, 100 Okl. 26, 227 P. 128; *Nickel v. Janda*, 115 Okl. 207, 242 P. 264; *Kline v. Mueller*, 135 Okl. 123, 276 P. 200; *Posey v. Van Tuyl*, 135 Okl. 50, 273 P. 887.

*House v. Gragg,* 1934 OK 601, 170 Okla. 550, 44 P.2d 832, 835 (Okla. 1934); *see also Slay v. State, ex rel. Dep't of Public Safety*, 2000 OK 11 (Okla. 2000).

In refusing to set aside deeds and mortgages on allegations of forgery, the Appellate Division of the Supreme Court of New York held:

A certificate of acknowledgment attached to an instrument such as a deed raises a presumption of due execution, which presumption, in a case such as this, can be rebutted only after being weighed against any evidence adduced to show that the subject instrument was not duly executed (see *Uvalde Asphalt Paving Co. v. City of New York*, 99 A.D. 327, 90 N.Y.S. 131). The rule as expounded by the Court of Appeals is that "a certificate of acknowledgment should not be overthrown upon evidence of a doubtful character, such as the unsupported testimony of interested witnesses, nor upon a bare preponderance of evidence, but only on proof so clear and convincing as to amount to a moral certainty" (*Albany County Sav. Bank v. McCarty*, 149 N.Y. 71, 80, 43 N.E. 427).

*Son Fong Lum v. Antonelli*, 102 A.D.2d 258, 476 N.Y.S.2d 921, 923 (N.Y. App. Div., 1984); *see also Namas Noor Sdn Bhd v. Williams*, 112 F.Supp.2d 580 (M.D. La. 2000); *Brown v. Ames,* 201 F.3d 654 (5th Cir. 2000).

Having concluded that the "clear, cogent and convincing evidence" rule applies in this case, we now turn to the standard of review applicable on appeal. Tenn. R. App. P. 13(d) provides: "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict."

Considered in isolation and considering only the literal language of the rule, appellate review of cases requiring clear, cogent and convincing evidence would be compromised. This Court recognized the problem in reviewing a case tried by jury under the clear, cogent and convincing evidence standard and departed from the literal language of the rule.

> Our review of a judgment based upon a jury verdict is governed by Rule 13(d), Tennessee Rules of Appellate Procedure. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict. We note, however, that there is a substantial body of case law that, as a matter of law, requires certain facts be established by clear, cogent and convincing evidence. For example the presumption of legitimacy may be overcome only by clear, cogent and convincing proof. We will, therefore, when we reach issues requiring the evidence to be clear, cogent and convincing, examine the record to determine if there is sufficient proof to constitute clear, cogent and convincing evidence to support the findings of the jury.

*Shell v. Law*, 935 S.W.2d 402, 405 (Tenn. Ct. App. 1996).

The struggle with the standard for appellate review in cases involving the "clear, cogent and convincing evidence" rule has been long and arduous for reasons well stated by Justice Traynor's dissent in *Beeler v. American Trust Co.*, 147 P.2d 583 (Cal. 1944). He observed:

> This is not an ordinary civil case, however, for, as the majority opinion concedes, it was incumbent upon plaintiff to support his contention by evidence, "clear, satisfactory and convincing; explicit, unequivocal and indisputable." *Wehle v. Price*, 202 Cal. 394, 397, 260 P. 878, 879; *Goodfellow v. Goodfellow,* 219 Cal. 548, 554, 27 P.2d 898. While it rests primarily with the trial court to determine whether the evidence is clear and convincing, its finding is not necessarily conclusive, for in cases governed by the rule requiring such evidence "the sufficiency of the evidence to support the finding should be considered by the appellate court in the light of that rule." *Sheehan v. Sullivan*, 126 Cal. 189, 193, 58 P. 543, 544; *see, also Moultrie v. Wright*, 154 Cal. 520, 98 P. 257. In such cases it is the duty of the appellate court in reviewing the evidence to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, as in the ordinary civil case where only a preponderance of the evidence is required, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists. When it holds that the trial court's finding must be governed by the same test with relation to substantial evidence as ordinarily applies in other civil cases, the rule that the evidence must be clear and convincing becomes meaningless. There is a contradiction in thus destroying the vitality of the rule while affirming its soundness.

*Beeler v. American Trust Co.*, 24 Cal.2d 1, 32-33, 147 P.2d 583, 600 (Cal. 1944) (Traynor, J., dissenting).

The Supreme Court of the United States addressed the problem underlying Justice Traynor's dissent in *Colorado v. New Mexico*, 467 U.S. 310, 315, 104 S.Ct. 2433 2437-38 (1984). Said the court:

> [B]ecause our inquiry turns on the evidentiary material Colorado has offered in support of its complaint, we find it necessary to explain the standard by which we judge proof in actions for equitable apportionment.
>
> The function of any standard of proof is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). By informing the factfinder in this manner, the standard of proof allocates the risk of erroneous judgment between the litigants and indicates the relative importance society attaches to the ultimate decision. See *Addington v. Texas*, 441 U.S. 418, 423-425, 99 S.Ct. 1804, 1807-1808, 60 L.Ed.2d 323 (1979).
>
> Last Term, the Court made clear that Colorado's proof would be judged by a clear-and-convincing-evidence standard. *Colorado v. New Mexico*, 459 U.S., at 187-188, and n. 13, 103 S.Ct., at 547-548, and n. 13. In contrast to the ordinary civil case, which typically is judged by a "preponderance of the evidence" standard, we thought a diversion of interstate water should be allowed only if Colorado could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are "highly probable." See *C. McCormick*, Law of Evidence § 320, p. 679 (1954).

*Colorado v. New Mexico*, 467 U.S. 310, 315, 104 S.Ct. 2433, 2437-38, 81 L.Ed.2d 247 (1984).

Tennessee recognizes that while the "clear, cogent and convincing evidence" rule defies precise description it is, in fact, an intermediate standard more exacting than the preponderance of the evidence standard while at the same time not requiring the kind of certainty inherent in the criminal standard of proof beyond a reasonable doubt. *See O-Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

Once this distinction is recognized, we are impelled to the same conclusion reached by the Supreme Court of Oregon that the "clear, cogent and convincing evidence" standard cannot co-exist with a "preponderance of the evidence" standard on the issue of burden of persuasion. *Riley Hill Gen. Contractors v. Tandy Corp.*, 303 Or. 390, 405, 737 P.2d 595, 604 (Or. 1987).

The Supreme Court of Maine came to grips with this incompatibility of oil and water in *Taylor v. Commissioner of Mental Health*, 481 A.2d 139 (Me. 1984), wherein it overruled its decision made nine years earlier in *Horner v. Flynn*, 334 A.2d 194 (Me. 1975). The court in *Taylor*

first recognized that prior Maine case law had developed two different meanings of the "clear and convincing evidence" standard of proof. First was the "highly probable" standard of *Colorado v. New Mexico. See Maine Human Rights Comm'n v. City of Auburn*, 425 A.2d 990, 996 (Me. 1981). The parallel standard set by *Horner v. Flynn* held that the clear and convincing evidence standard required to establish fraud "does not identify a level of proof higher than proof by a preponderance, but rather denotes the better quality of evidence that is required to satisfy the preponderance standard in that and some other special cases." *Taylor*, 481 A.2d at 153.

In overruling *Horner* and establishing the *Colorado v. New Mexico* "highly probable" rule as the correct one, the court in clear and definitive reasoning settled the law in Maine in a manner that we believe to be equally correct in Tennessee. The court stated:

> For the reasons expressed below we conclude that the *Horner* definition of "clear and convincing evidence" should be abandoned. We adopt the first definition, by which the party with the burden of persuasion may prevail only if he can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable'." *Colorado v. New Mexico*, ---- U.S. at -----, 104 S.Ct. 15 2438.

> As a practical matter, the *Horner* definition of "clear and convincing evidence" removes the higher standard of proof aspect of the lower court's factual findings from appellate review. Under *Horner* the question whether the evidence "which by its nature is capable of inducing belief *does in fact* induce belief is the responsibility of the factfinder to determine." *Horner*, 334 A.2d at 200 (emphasis in original). In *Horner* itself, the Law Court upheld a finding of fraud even though the trial court had given the jury, albeit without objection, a mere preponderance instruction without any of the "clear and convincing evidence" qualifications. *Id.* at 203. In effect, the appellate court reviews a finding in favor of the moving party under *Horner* just as if the moving party needed only to establish his allegations by a preponderance. Believing, as we do, that the policies that motivated the imposition of the "clear and convincing evidence" standard apply with equal force at both the factfinding and appellate stages, we prefer a definition of "clear and convincing evidence" that allows meaningful appellate review of the lower court's findings. Under the intermediate standard of proof we can address the question whether the factfinder could reasonably have been persuaded that the required factual finding was or was not proved to be highly probable.

> The application of the *Horner* definition at the factfinding level creates needless difficulties. Under *Horner* the factfinder, often a jury, is required to make separate, confusing and potentially inconsistent determinations. After the jury has heard all of the evidence, it is asked to decide whether the moving party has offered evidence with a "high belief-inducing capability," i.e., evidence of a type that may prove a factual conclusion to be highly probable. Any factfinder may be hard pressed

-10-

to separate the question whether the moving party's evidence has a "high belief-inducing capability" from the question whether the evidence, as a whole, is persuasive of the fact in dispute. As one commentator has argued:

> By requiring that the jury evaluate the burdened party's presentation to determine whether it has a "high belief-inducing capability," however, *Horner* seems to require a preliminary assessment that the asserted facts are highly probable. Any effort to convey to a jury in a single set of instructions the concepts of "preponderance" or greater weight of the evidence and "high belief-inducing capability," with or without acknowledging this contradiction, is likely to result in confusion. [footnote omitted]

Note, *Horner v. Flynn: A Preponderance of Clear and Convincing Evidence*, 28 Me. L.Rev. 240, 248 (1976). In theory, *Horner* requires the same two-step assessment of the evidence by a judge sitting as the trier of facts. But, for a trial judge also, the *Horner* double process is difficult at best to carry out, and at worst is likely to water down the significance of the heightened standard of proof required to protect important public interests.

As we have explained, a standard of proof serves to allocate the risk of error and to instruct the factfinder as to the degree of confidence society expects for a particular decision. To effectuate those purposes a standard of proof should operate to set the degree to which the factfinder must be persuaded of a particular factual conclusion. Where, as here, an important public interest and the desire to preserve prior judicial orders and adjudications lead us to employ the "clear and convincing evidence" standard for the release of BRI acquittees, the lower court must find the required factual conclusion to be "highly probable." Under the *Horner* approach the factfinder need only be persuaded that the factual conclusion in dispute is more probable than not. The additional requirement in *Horner* that the conclusion be supported by high quality evidence cannot adequately satisfy the objectives of the "clear and convincing evidence" standard. A "high quality evidence" requirement does not serve to allocate the risk of error and serves only indirectly to instruct the factfinder of the degree of confidence expected for a certain result. For example, there are many instances in which the evidence on both sides might be deemed of "high quality." In such instances, *Horner* permits the party bearing the burden of proof to prevail despite having only a bare preponderance of the evidence. Although the introduction of high quality evidence may well be an important element in meeting the intermediate standard of proof, that alone would not suffice. The factfinder must be persuaded, on the basis of all of the evidence, that the moving party has proved his factual allegations to be true to a high probability. That degree of confidence effectuates the policy purposes for which we have, in this case and others, adopted the "clear and convincing evidence" standard.

Finally, *Horner* is out of step with the law of the rest of the country. The federal courts and virtually all other states treat "clear and convincing evidence" as an intermediate standard of proof lying between the preponderance and the reasonable doubt standards. *See* 28 Me.L.Rev. at 242-45.

*Taylor v. Comm'r of Mental Health*, 481 A.2d 139, 153-54 (Me. 1984).

No statute establishes a clear, cogent and convincing evidence standard of review such as would come within the exception pronounced by Tenn. R. App. P. 13(d). The "clear, cogent and convincing evidence" standard in this case is of common law origin and by any analysis associated with logic the rule pronounced in *Shell v. Law*, applies to this non-jury[1] case and we must determine on appeal *de novo* whether or nor the plaintiffs have proved their case by clear, cogent and convincing evidence. The determinative question under this standard of review is whether or not the plaintiffs have carried the burden to establish that it is "highly probable" that the two deeds from John E. Acuff, Sr. to Brenda O'Linger are forgeries.

FACTS

One fact in this record is undisputed and indisputable. Until the day he lost consciousness from his fatal stroke, John E. Acuff, Sr. was an accomplished businessman, strong minded, independent, and completely in command of his business endeavors.

In the words of one of his business associates:

> Q        One of the things in your business dealings with John Acuff, isn't it true, that any time you dealt with him in a business transaction it was his way or no way?
> A        He made the rules, right.
> Q        If you didn't play by his rules, you didn't play?
> A        Right.

There are no "gray areas" in the proof. There is no evidence of unsoundness of mind, confidential relationship, undue influence, overreaching, or any other intrusion on the person or mind of this astute businessman. The two deeds in issue are either the genuine acts of John E. Acuff, Sr. or they are forgeries. The first of the deeds is dated August 16, 1996 and purports to convey to Brenda O'Linger the property on which her mobile home dealership was located as well as a tract of land immediately across Godsey Road from the dealership. The mobile home dealership tract

---

[1]        This case was tried by an advisory jury impaneled *sua sponte* by the trial judge to provide advisory answers to special interrogatories concerning the alleged forgeries. The trial court specifically adopted the answers of the advisory jury and pronounced its own judgment in the case. Neither party had demanded a jury and the trial court was free to accept or reject the advisory jury's conclusions. *State ex rel. Webster v. Daugherty*, 530 S.W.2d 81 (Tenn. Ct. App. 1975); *McDade v. McDade*, 45 Tenn. App. 487, 325 S.W.2d 575 (Tenn. Ct. App. 1958). The case is reviewed on appeal as a non-jury case.

was, at the time of the conveyance, under lease from Acuff to O'Linger with rental payments of $3500 per month. The deed indicates that it was prepared by John Acuff himself and contains the following provisions:

> A joint suvivorship [*sic*] is being created as a condition of this agreement. The grantor and grantee jointly agree that should either party become deceased the property would revert to the surviving party free of encumbrance in fee simple. In the event of the grantee's death the ownership of the property would revert back to the grantor with all improvements. In the event of the grantor's demise the ownership of the property would be transferred to the grantee free and clear and any outstanding balance of the purchase price would be null and void.
>
> . . . .
>
> FOR AND IN CONSIDERATION OF THE SUM of two hundred fifty thousand ($250,000) dollars payable in installments of $3500 per month, with no interest due grantor. All payments made prior to the execution of this agreement will be applied toward the purchase price.

The deed bears a signature purporting to be that of John Acuff together with a witness signature of Larry Simcox, and it is notarized under date of August 16, 1996 by Roy Brackett, Notary Public at Large whose commission was to expire March 8, 1999. The deed was recorded November 22, 1996, twelve days after the death of John Acuff. The second of the deeds in issue purports to be prepared by John Acuff and is entitled "Quitclaim Deed". It is dated September 30, 1996, and purports to bear the signature of John Acuff again witnessed by Larry Simcox, and notarized under date of September 30, 1996 by Roy Brackett. This deed purports to convey the tract referred to by the parties as "the railroad tract" and it was recorded December 10, 1996, one month after the death of John Acuff.

The plaintiffs in the case individually and as co-administrators of the Estate of John E. Acuff, Sr. are his four children by his marriage to Jewel Acuff, though only one of them, Joyce Faye Burkhalter, testified as a witness in the case.

Mrs. Burkhalter testified that she qualified as co-administrator of her father's estate, that she attempted to gather together all of his papers, and that when she viewed the recorded deeds in issue that were purportedly prepared by her father and recorded subsequent to his death, she and her siblings became suspicious and this suit resulted. She had only a single discussion with her father concerning Brenda O'Linger that involved nothing of significance. She was not present when either of the two deeds in issue were executed.

Kay Miser Ethridge was desk clerk at Acuff Country Inn and generally wrote out checks for Mr. Acuff to sign. She never saw Mr. Acuff use a computer or a typewriter. She was not present at the time either of the two deeds in issue were allegedly signed.

-13-

Kevin Lee Featherston, one of several attorneys who did work for Mr. Acuff, was called as a witness and testified generally as to the practices of Mr. Acuff in his many real estate transactions. He testified in part:

> Q        And you indicated that John Acuff was very well versed in, as I understand it, property descriptions and deeds and the way he wanted his conveyance handled?
> A        He was real particular about how things happened, yes.
> Q        Isn't it true that once he made up his mind how he wanted a transaction to happen that it was, it was either going to be his way or he wasn't going to do it; isn't that correct?
> A        I assume, I mean he was pretty forceful but I don't know what he thought every time.
> Q        But he was very forceful about his transactions being conducted the way he wanted them?
> A        The ones I was involved in, yes.

Mr. Featherston was not present at the time the two deeds in issue were allegedly executed.

William Gallagher, Jr. was another attorney who testified generally that Mr. Acuff was very knowledgeable about real estate transactions.

The next witness was Doris T. Brown, John Acuff's business partner and his cohabiting companion from 1972 until his death.  They held themselves out in the community to be husband and wife and she was familiar with all of his real estate.  She testified:

> Q        At any point in time did Mr. Acuff ever mention to you or tell you that he had transferred that mobile home property to Ms. O'Linger?
> A        He did tell me that she had an option to buy.
> Q        All right.  Let's talk about that.  Where the mobile home property is, there are actually two separate tracts of land; is that correct?
> A        Yes.
> Q        And there is the tract where the mobile home lot sits?
> A        Yes.
> Q        And then there is a roadway that goes through there; is that correct?
> A        (Witness nods head affirmatively.)
> Q        And then there is an unimproved tract across the road?
> A        Yes.

Q   Now, when Mr. Acuff told you that there was – Ms. O'Linger was wanting an option or had an option for that property, which portion of that property was he referring to?

A   Well, I understood that it was the vacant piece.

Q   Okay. And did you and he discuss the price that she had for that vacant piece of property?

A   250,000.

Q   And did you agree with that price for that vacant part?

A   Well, all I really said was, you know, that might be a low price since the hospital was coming in there.

Q   Was there every any discussion about her acquiring the land where the mobile home lot was?

A   Not that I recall.

Q   Was there already a lease in place for that portion?

A   She did have a lease at the time she acquired it.

Q   And do you know what the monthly rental was?

A   The best I recall was 3500 a month.

. . . .

Q   Did Mr. Acuff ever mention to you his intent to give the railroad property to Ms. O'Linger?

A   Not that I recall.

Q   Was there ever any discussion regarding Ms. O'Linger and the railroad property?

A   Not that I recall.

Q   In the years that you were together with Mr. Acuff and all of the transactions that you-all were involved in, did you ever know Mr. Acuff to give away real estate?

A   Not that I can recall.

Q   Would you have considered that unusual?

A   Probably.

Q   How did you first learn about the alleged transfer of this property, what Ms. O'Linger claims was the property that was transferred?

A   I guess the first time I learned about it was probably when she came to the house.

Q   All right. Was that before or after Mr. Acuff passed away?

A   It was after, shortly.

Q   And can you tell the jury what she said to you?

A   She just told me that she had a couple of deeds that he had made over to her and had wanted her to wait until after the first of the year to register them, but now that things had happened that she didn't have a choice.

Q   How did you respond?

A       I didn't say anything. I did tell her that we were partners and where the money came from for him to be what he was today or at that time.
Q       I ask you to look at Exhibit 2, that's the warranty deed. You see that, you see where it says John Acuff?
A       Yes.
Q       Sitting here in court under oath, can you tell this jury that that is your partner John Acuff's signature?
A       It looks like it.
Q       Is it? Can you tell us whether it is or is not?
        MR. CLEVELAND: Objection, Your Honor, she's already answered.
        THE WITNESS: It looks like it.
        MR. MCKOON: I asked her to be responsive.
        THE COURT: I think she did. I sustain the objection.

She further testified that she had never known Mr. Acuff to have a word processor or to prepare his own deeds.

She further testified:

Q       Did you know about these deeds before Ms. O'Linger came to your residence?
A       I'm not sure whether - - Roy Brackett had came by to check on me and he told me that John had - - he had signed those or if this was my first time to have known. I can't recall that.

She further testified that John Acuff was a very secretive person and very demanding in his business transactions. In speaking of the "John Acuff" signature on each of the deeds in issue she testified: "It looks like it."

Mrs. Brown was not present at the execution of the deeds in issue. Mrs. Brown had settled before trial her own law suit against the Acuff estate relative to their business partnership for $1,500,000.

Further proof of the plaintiffs from Vickie Bradford, John Stamps, and Dean Lay asserted that even after the execution of the deeds in issue, Mr. Acuff was still negotiating for sale of portions of the property described in these deeds to third parties.

After a very extensive "gate keeping" hearing under principles established by the Supreme Court in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), the trial judge allowed the testimony of Thomas Vastrick and Brian Carney, offered by the plaintiffs as handwriting analysis experts on the basis that their testimony could "substantially assist the trier of fact" under Tennessee Rules of Evidence 702 and 703. While the Tennessee standard for admissibility set forth

-16-

in *McDaniel* is more restrictive than the rule under its federal counterpart, we are still bound by the general rule that questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). We see no abuse of discretion in the admission of the testimony of Vastrick and Carney. Both of these handwriting analysts testify that the signatures on the two deeds in issue are in fact tracings made from a genuine signature of John Acuff appearing on an exhibited document in the case called a "landlord waiver." This testimony subjected to vigorous cross-examination is to be weighed along with all other evidence by the trier of fact under the "clear, cogent and convincing" evidence rule.

The defense presented first the testimony of Brenda O'Linger. She and her former husband were involved in the mobile home business for eleven years prior to his death with mobile home lots in Scottsboro, Alabama and Trenton, Georgia. Mr. Acuff and one Larry Simcox were undertaking to open a mobile home lot in Jasper, Tennessee, and Mr. Acuff asked Joyce Wayne, a friend from childhood, to take him to see Ms. O'Linger to look over her mobile home operation. After lengthy discussions, they agreed that Ms. O'Linger would lease and improve the Jasper mobile home lot at a $3500 per month rental. She spent some $80,000 improving the property and the business was a near immediate success. Mr. Acuff and Ms. O'Linger became not only business associates but close, personal and social associates after the Jasper mobile home lot was opened. As to the August 16, 1996 alleged execution of the deed to the mobile home dealership lot and the vacant lot across Godsey Lane, Ms. O'Linger testified:

> [ h]e wanted to come down and see me. He was there with the deed to get the deed signed to the property.
> Q    To which property?
> A    To the property there, the mobile home property.
> Q    And what happened?
> A    He give it to me and I read it, and there was some things in there. I was kind of - - I don't know if the word skeptical would be right, but you know, it's something I had to read two or three times to get the full meaning of it.
> Q    Let me interrupt you just a minute. Let me show you this document that has been marked an exhibit and see if you can identify that?
> A    Yes, sir.
> Q    What is that?
> A    That's the deed to the property.
> Q    Is that the same one that you were just testifying about?
> A    Yes, sir.
> Q    Can you relate to the jury now looking at the document some or all of the language that gave you concern?
> A    The part that I was concerned about was the joint survivorship.

Q       Did you understand what that meant?

A       Well, no, I didn't really understand it. I read it two or three times. And I asked him, I said, what is this, John, what does this mean?

Q       Did you sign this anywhere?

A       Yes, I did.

Q       And where is that?

A       I signed right here on this front page where it's got the survivorship clause in it.

Q       And at that time that you signed it, what did you understand that survivorship clause meant?

                                    . . . .

Q       You said you didn't really understand it?

A       No.

Q       By the time you got around to signing it, did you think you understood what it meant?

A       I thought I did.

Q       And what did you think it meant at that time?

A       I thought it meant if something happened to him that the property would be paid for because I knew he wanted me to have it anyway.

Q       What would happen if you died?

A       He would get it and all my improvements.

                                    . . . .

Q       Did anybody come to the conference room after you all were there?

A       Yes, sir.

Q       Who was that?

A       Roy Brackett.

Q       All right. And what, if anything, did Roy Brackett do after he got into the room?

A       He is a notary and he notarized it.

Q       How did the deed get from Mr. Acuff to Mr. Brackett when Mr. Brackett notarized it?

A       He give it to him.

Q       How did he do that, can you describe it?

A       He slid it across the table to him and said - -

        She further testified that a Mrs. Mitchell was in and out of the room and that Larry Simcox also signed the deed as a witness. Ms. O'Linger and Mr. Acuff left the meeting together with Mr. Acuff taking the deed.

-18-

Ms. O'Linger testified that the September 30th quitclaim deed to the railroad property followed essentially the same procedure in that Mr. Acuff brought the deed with him, signed it, Larry Simcox witnessed the signature, and Roy Brackett notarized it. She further testified:

> Q All right. Whose signatures do you see?
> A I see John's and Roy Brackett's and Larry Simcox's, and I see some others but I guess it was put on afterwards. It's just the recording.
> Q And are those the signatures that you just testified were put on there that day?
> A Yes, sir.
> Q Did you already know Roy Brackett?
> A I know him as being with John, and I knew that he was the building inspector, but as far as me knowing him, no, not really.
> Q How did you know he was the building inspector?
> A He had written me an ugly letter one time.
> Q Did it cost you any money?
> A Yeah, a little bit.

As had been done with the August 16th deed, Mr. Acuff took the deed with him from this meeting.

Beverly Mitchell Cain testified at trial that she was a childhood friend of Brenda O'Linger and through the years had seen her on occasion. She came to the Jasper mobile home sales lot on August 16, 1996 interested in purchasing a mobile home. She was in a room with strangers she being only acquainted with Brenda O'Linger. She testified:

> Q Did you know anybody that came in and out of that office that day?
> A No, not one person.
> Q You said earlier that sometime later after you and Mr. Acuff were out in the kitchen waiting for her, sometime later you made coffee?
> A Yes, sir.
> Q How did that come about?
> A Well, Brenda had asked me to go eat, and I said yes because it was getting late. Like I said, I know it was after lunch because I ate before I went over there. Like I said, they were talking. I was in and out. He told her, he said, we need to get this deed notarized. And she asked me if I was a notary. When I worked, which I do not work anymore. I haven't since 1991. She asked if I was a notary, and I said, no, not anymore. I used to be. And she said, oh, okay. He said, well, I can call someone.

I just remember bits and pieces because I didn't know I would need to remember anything that was said. I know he said something about ex-mayor, and he kept calling somebody republican. I don't know what he meant by that. Of course, I didn't ask because it wasn't any of my business.

Q      Now, was somebody called, was a notary called then?
A      Yes, sir.
Q      Were you there when the phone call was made?
A      Mr. Acuff made the call. I assume this is the guy he called that came because I didn't know anyone.
Q      How long was it between the phone call and the time somebody showed up?
A      I would say just a few minutes, not like an hour or anything like that.
Q      More like 10 or 15?
A      Not very long.
Q      It's the middle of the afternoon, and I guess I can't get my mind off the coffee. When did you go make the coffee?
A      When he called for this guy to come and notarize, Brenda asked me if I would make some coffee, and I said yes. Like I said, the kitchen - - there's just a door. I just stepped right out there.
Q      And how long did it take you to find the stuff and make the coffee?
A      It didn't take too long. It was all piled up right there. I put it on, you know, the whole pot of coffee because I didn't know how many people were going to be there or what.

. . . .

Q      After you took the coffee in there, did you stay or leave?
A      I could only take two cups at a time. Like I said, people were in and out and in and out and the phone was ringing. I wasn't paying a whole lot of attention. And I just heard him, Mr. Acuff, I don't know if his name was John or Jack. I never met him but that one time. Anyway, I heard him say, you know, I'm going to sign this. It needs to be notarized. And what he signed, I didn't read it. I mean, I didn't have the right to. I just saw something there that he signed, and he told this other guy, here, notarize this. And I don't really know the other guy's name. I just know he was short and sort of red faced. I don't remember his name.
Q      Did you actually see Mr. Acuff put the pen on the paper?
A      On the paper, yes, sir. To what - - like I said, I didn't read it.
Q      Who else was in the room, if you can recall, right then when he signed it?

A    I know that this short guy Bramlett or someone that he had called. I assume he's the one that he called to notarize it. He was there and Brenda was in there and I can't remember this guy - - which I didn't know his name at the time. A heavy set guy kept coming in and out with papers. He could have been in there. I didn't even recall. I took him two cups of coffee and sat it down because they were like middle ways at the table on up and I sat it down. Like I said, I just stepped out the door and I got more coffee. And Mr. Acuff was signing a paper, and I sat that down and he was saying to this guy, here, notarize this. And I already had the coffee poured. I took another one in there and I saw him sign it. But like I told you, I did not read what was signed. I assumed it was a deed because he was - - I heard them joking back and forth about it, him telling her he was making her a millionaire and stuff like that, so I just assumed that's what it was.

Q    You stepped out of the conference room then to get the second two cups of coffee in between the time that Mr. Acuff signed it and the time that the notary signed it?

A    He slid it down the table to this other guy, but it wasn't three steps to the table where I had set the coffee. It was just right out the door.

Q    Do you remember if the notary was actually already there and in the room when Mr. Acuff signed the piece of paper?

A    Yes.

Q    And was he?

A    Yes. It's a long, long table, and there was a calculator. I remember that. And Brenda was up closer to that. And he was further down this way like if I stepped in the door. I didn't know who he was. Of course, she never introduced me to anyone. I didn't expect it. And I tried to stay out.

Larry Simcox testified that he had formerly been Mayor of Jasper and for thirty years had been a friend of Mr. Acuff. He worked for Ms. O'Linger after Mr. Acuff leased the mobile home sales' lot to her. He regarded Mr. Acuff as one of the most intelligent men he had ever met and testified that he was present at the execution of both the August 16, 1996 and the September 30, 1996 deeds, that both were signed by John Acuff, and both were notarized by Roy Brackett.

Roy Brackett, the notary public on both deeds, testified that he had lived in the Jasper area for about thirty years, and that he was former building commissioner for Marion County. He and John Acuff had been friends since the early 1970's. Relative to the August 16th deed he testified that John Acuff called him and asked him to come over to the O'Linger offices to notarize a document for him. When he arrived at the conference room John Acuff and Ms. O'Linger were there along with Larry Simcox and a number of customers. He testified:

Q       Okay. What, if anything, did John Acuff say or do when you came into the room?

A       He asked me if I would notarize a deed.

Q       How did he say it?

A       When I sat down, he took his hand like this and slid it over to me and said sign this Mr. Notary Republican. He called me notary republican.

Q       Not notary public but notary republican?

A       Republican, like maybe I might be a republican.

Q       Is that a little joke?

A       Yeah.

Q       And when he slid the paper over to you, did you look at it?

A       I did.

Q       How close a look did you take?

A       Well, I looked at the legal descriptions. I just kind of glanced at it like I'm doing now. I looked it over and notarized it.

Q       What, if anything, did you notice about the legal description?

A       It did say Highway 28. It looked like the property we're talking about right there.

Q       That property right there is on Highway 28?

A       Yes, sir.

Q       Now, did you see John Acuff sign this deed?

A       No, sir, I didn't.

Q       Do you know if it was already signed when you walked in the room?

A       It was signed when I walked in the room, yes, sir.

Q       Were there any other signatures or marks on the paper when you first saw it?

A       It was already signed when I got there.

. . . .

Q       I believe you say you signed the notary to notarize John Acuff's acknowledgment; is that right?

A       Yes, sir.

Q       What else, if anything, did you write on that piece of paper?

A       Well, I put the date on there, the month, the year, and of course, I signed my name and also when my commission expires.

Q       What date and month is it you're talking about filling out?

A       The 16th day of August, 1996.

Q       Is that above John Acuff's signature?

A       It's below it.

Q       Did you use your own pen or a pen that was there, what did you use to sign it?

A       I used my own pen.

Q       That's a different color, isn't it, from the other ink on the page?
A       Yes, sir.
Q       Now, let me ask you, if you would, to look at that acknowledgment.  Is your notary seal there?
A       Yes, sir.

He further testified that on September 30, 1996, John Acuff asked him to notarize the quitclaim deed to the railroad property and that he did so.

On August 19, 1997, Mrs. Joyce Wayne testified by evidentiary deposition some seventeen months before the actual trial.  She was suffering from Parkinson's disease and hypertension, therefore, her availability in the future was uncertain.  She was sixty-seven years old at the time and had lived in the south Pittsburg-Richard City area all her life.  She had known John Acuff since early childhood and testified that they were like brother and sister.  Mrs. Wayne was also well acquainted with Brenda O'Linger and her late husband Bill O'Linger, they having been in the car and mobile home business together.

In speaking of Mr. Acuff and Ms. O'Linger, Joyce Wayne testified:

Q       How did he come about - - how did he even know about Brenda O'Linger?
A       Oh, dear.  Well, how he knew about her to start with, I have no earthly idea, but in July of - - well, this is '97, isn't it?  '96.  I guess it's been about two years, I guess, two years in July.  I don't remember what time it was, but my aunt and my cousin was in from Paducah, and he called me one day and he said he wanted to go meet Brenda.  I said, well, go yourself.  I said, just go to the Trenton lot.  She'll be over there.
        He said, no.  He said, I want some kind of introduction.  I forgot now what he said.  A gentleman's introduction or something like that.
        I said, well, you can just go on, John, and he wouldn't do it.  So we called and made an appointment and we was supposed to meet her at 12:00, I believe.
Q       Do you remember who called and made the appointment?
A       I did.
Q       I guess for our background purposes here, how did you know Brenda O'Linger at that time?
A       Her husband and I were in business together.
Q       Do you remember what you did at that time?
A       Cars and mobile homes.
Q       And do you remember how long ago that would have been?
A       Well, let's see.

-23-

Q        Just about maybe what year?

A        Well, we were in business from, I'd say from about '59 on up until '74 or something. I'm guessing. I think that's about right.

Q        That's fine. And you called Brenda?

A        Uh-huh.

Q        Do you remember what happened then or what was said to you?

A        Well, we made the appointment and it was on a Saturday and John called me two or three times and asked me, are you ready to go.

        And I said, John - - I'm going to tell this on her because it's the truth. I told him, I said, 12:00 to Brenda, it might be 2:00 or 3:00. I said, don't worry about getting there on time, but he was worried. So we go over and meet him at - - it was about 11:30, I guess, and he drives his little car or whatever that is, Blazer, I think. We followed him because we were going on to Chattanooga, we told him. We met him, and of course, she was late.

According to Mrs. Wayne, from that day forward Mr. Acuff was infatuated with Brenda O'Linger whom he nicknamed "Dolly," and thereafter all of his many conversations with Joyce Wayne were dominated by the subject of "Dolly."

Mrs. Wayne testified:

Q        Do you know if John every made any deeds to the property?

A        No.

Q        To Brenda?

A        Oh, yeah. Well, they came by here one night and wanted me to go to the Patton House and eat supper with them. And he had a deed and handed it to Brenda, and he said, here it is, said, here's what you've been wanting. And Brenda just took it and threw it in the back seat. And I said, that's a deed. And she said, no, it's not. It's a copy. And I said, looks like the real thing to me.

        I pulled it out, and he'd done some drawings on it. I said this is concerning that property over there. And John said, yeah. Said he's going to take the fill dirt or top soil, whatever it is, from the hospital over there and fill up some spots down there in that lot for her. Now, I don't know that much about property.

Q        Did you actually see the deed?

A        Yes, I picked it up. She threw it in the back seat. And I said, Brenda, this is a deed. And I just sort of - - there's a longer sheet of paper other than the deed and it had his writing on it. And he said that's where the fill dirt and filling in around the mobile homes there.

-24-

Q       I've got a copy of the deed with us, Ms. Joyce.  I'd like for you to look at - - and we'd like to make that an exhibit to your deposition.

Do you recall seeing that deed?  If you need your glasses, please, go ahead and get those.

A       Now, I know nothing about - - oh.  There was a longer - - wait a minute.  There was a longer sheet of paper in there and he had written on the - - scribbled on the sides."

MR. LYPE:  Your Honor, may we ask that the record reflect she was looking at a document when she made that statement.

Q       Do you recall looking at the actual - -

A       No, I mean, I glanced at it and I said, Brenda, this is a real deed.

Q       Does the deed that you're holding - -

A       I didn't read it.  I just looked at the top and I said, well, Brenda, this is a real deed.

Q       I'm not asking you, Ms. Joyce, if you read the deed.  But do you remember any of the characteristics of the deed that you looked at that night?  Do you remember what it looked like if it said - - do you remember reading anything on it?

A       You know how they put on the - - I said, it's a real deed, Brenda.  And she threw it in the back seat and I picked it up and put it in a big pocketbook she had back there.  I said, you'll lose this.  And I said, be sure you don't.

Q       When you saw the deed did you look through the pages of it?

A       I just glanced, just like this.  I said, it is a real deed, too.

Q       Do you recall seeing John's signature on it?

A       Yeah, I saw his signature.

Q       Does the copy that you have there, Ms. Joyce, does that look like the deed you saw that night or the signature part of it?

A       Yes, he had already signed it.

Joyce Wayne further testified:

Q       Do you remember anything being said about any railroad property?

A       Yes.  He told her that he was giving her the railroad property, and he said, and I don't know that I'm doing you a favor.  He said it might be bad news, you know, instead of something good.  And she said, well, why would you do that to me, John?  And he said, oh, because I like you.  She said, well, why would you say that it would be, you know, not a credit?  And he said, it could be a liability rather than an asset and I don't know.

Q        Do you remember if that deed was with the other one or if there was a deed that said anything about a railroad?

A        I think they was all together. You know, it was all in one pack, is what I was trying to say a minute ago, it looked like. But I didn't go through that. I just looked at the one on top because we started pulling out by then and went down and picked up another lady.

Q        Do you remember Brenda - - I think you may have said this. I'll ask you again. Do you remember what Brenda said about the deeds themselves being copies?

A        Yeah, that's what it was, copies instead of duplicates. She said, oh, those are just copies, John.

Q        And do you remember what John said back to her?

A        He said, you better take a look and see. He said, that's the real thing.

Q        Okay. What did you do with the deeds after that?

A        I put them in the back of Brenda's car in a big old tall - - I'd call it a shopping bag, but she called it a pocketbook.

Q        Do you remember if anything was said about her losing the deed?

A        I did. I said, Brenda, don't lose this. I said, you'll throw it around in the car for a few days and it'll end up in the trunk and then God only knows where. I said, I'm going to put it in here with all this other junk. And I said, please put it up. When I got out of the car, I said, Brenda, please put that up where you'll know where it is.

Finally, Mrs. Wayne testified at the end of her deposition:

THE WITNESS: He wanted Brenda to have where she was and across the street there so she could do what she wanted to do, you know. He said that she could take care of it and it would be an asset to the community and to the hospital up there, you know. He said, he knew that she'd fix it up and she was working on the offices and things then. He wanted those raggedy mobile homes fixed up and that's what she said she was going to do, put a building on the other side. He said he wanted it to be an asset and he knew that she'd do it.

This case was diligently tried by both sides and by the trial court. Practically all of the witnesses were to some degree impeached by cross-examination. Many objections were interposed as to hearsay and as to the dead man's statute. Much that might have been subjected to such objections went into evidence without objection from either party.

-26-

The plaintiffs have the burden of establishing under a clear, cogent and convincing evidence standard that it is "highly probable" that the two deeds in issue are forgeries. To sustain this burden would require an active conspiracy between and among Brenda O'Linger, Larry Simcox, Roy Brackett, Beverly Cain, and Joyce Wayne. The evidence of the plaintiffs and particularly the expert handwriting analysis from the witnesses Vastrick and Carney casts troublesome shadows in the case but considered as a whole, the evidence in the opinion of this Court does not establish that it is "highly probable" that the deeds of August 16, 1996 and September 30, 1996 are forgeries.

## THE REBUTTAL TESTIMONY OF JOYCE BURKHALTER

At the time of Mrs. Wayne's deposition, the plaintiff, Joyce Faye Burkhalter, daughter of John E. Acuff, Sr., was present and listened to the entire deposition. Mrs. Wayne was subjected to an extensive direct examination by counsel for Brenda O'Linger and an extensive cross-examination by counsel representing all of the plaintiffs. Throughout this deposition, which on the whole was quite favorable to the defendant, Mrs. Burkhalter said nothing and counsel for the plaintiffs said nothing about any alleged previous inconsistent statements Joyce Wayne had made on November 8, 1996 at the hospital immediately preceding the death of John E. Acuff, Sr. The defendant subpoenaed Joyce Wayne for live testimony at the time of the trial but the subpoena was quashed by the trial court on motion of Joyce Wayne supported by her own affidavit and a medical affidavit indicating that her continually deteriorating physical condition prevented her from coming to court and testifying as a witness.

On the last day of the trial, January 14, 1999, Joyce Faye Burkhalter was called by the plaintiffs as their last rebuttal witness over the vigorous objections of the defendants. These objections were overruled and Mrs. Burkhalter was allowed to testify as follows:

Q       Mrs. Burkhalter, you were beginning to explain about a conversation you had with Joyce Wayne, as I understand it, in the hospital when your father was gravely ill. Remind me of the time frame of that again, please.
A       It was sometime during the day on Friday. It would have been November the 8th, 1996. It was when Daddy was already in intensive care and was not able to speak to anyone and would not ever be able to speak to anyone again. And Joyce Wayne pulled me aside and told me she wanted to help me by telling me the properties that she knew of that Daddy had.
Q       Help you to do what, ma'am?
A       Help us to get the estate together. She knew we had to be collecting properties, that it would be a long legal process once Dad passed away. And she felt like she had been a friend of the family a long time, she could talk to me, and she could tell me what she knew.
        She began to tell me that Daddy owned a motel, that he had the property where the Acuff building is. That all those units were rented, and A.C. Wells could help me with the rent on those to find out who paid what and how it was paid. She also told me that he owned the railroad property at Monteagle and that

Brenda O'Linger was paying rent on her mobile home sales lot. She wasn't sure of the amount on that, but Larry would be able to help me with the rent on that.

Q    Did she give you other information about other properties as well?

A    She probably did. I can't recall all of them. She tried to tell me everything that she knew, but that's all I can remember.

Q    In that conversation, Mrs. Burkhalter, with Joyce Wayne on November 8, 1996 while your father was gravely ill, did she tell you anything about deeds to Brenda O'Linger from your father?

A    No.

The critical evidentiary question involves Tennessee Rules of Evidence 613 and 806. In resolving this issue, the time sequence is critical. First of all, the parties agreed to take the evidentiary deposition of Joyce Wayne on August 19, 1997 in order to preserve her testimony in the event that her physical condition continued to deteriorate, and she was not available to testify at trial. As the appellees assert on page 43 of their brief:

While the caption of Joyce Wayne's deposition indicated that it was taken by agreement to be offered as proof at trial . . . after the deposition the defendants subpoenaed Joyce Wayne to provide live testimony . . . . Clearly the defendants anticipated and desired to offer Joyce Wayne's live testimony at trial, and when she was deemed unavailable by the trial court, her deposition testimony became an out-of-court statement offered at trial to prove the truth of the matters asserted, i.e. hearsay. The trial court correctly noted that at the time the deposition had been taken, Joyce Wayne had not been declared unavailable to testify at trial.

The deposition was taken on August 19, 1997. The critical event in the rebuttal testimony of Joyce Burkhalter occurred on November 8, 1996. It is obvious that Mrs. Burkhalter was fully aware of the alleged November 8, 1996 events during the time that she sat silently through the deposition for proof of Joyce Wayne.

If Joyce Wayne had been physically able to testify at the trial of the case in January 1999, Rule 613(b) would obviously have applied, providing:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is offered an opportunity to interrogate the witness thereon, or the interests of justice otherwise require it.

At the deposition for proof, however, there was no compliance with Rule 613(b) as the alleged prior inconsistent statement of November 8, 1996 was never mentioned.

When the subpoena of Joyce Wayne to testify at the hearing of the case was quashed by the trial court, the defendants read the evidentiary deposition into evidence. Plaintiffs assert that under

these conditions, Tennessee Rule of Evidence 806 authorized the in court rebuttal testimony of Joyce Burkhalter. Rule 806 provides:

> When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked and, if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

The adoption of the Federal Rules of Evidence and the subsequent adoption, near verbatim, of those rules as the Tennessee Rules of Evidence, involved some significant changes in the rules of the common law. Tennessee Rule of Evidence 613(b) presented a troublesome ambiguity as it did in federal law and for those jurisdictions such as Tennessee that had long adhered to *Queen Caroline's* case, 2BR. & B. 284, 129 Eng.Rep. 976 (1820). The rule in *Queen Caroline's* case states:

> If it be intended to bring the credit of a witness into question by proof of anything he may have said or declared touching the cause, the witness is first asked, upon cross-examination, whether or not he has said or declared that which is intended to be proved.

*State v. Martin*, 964 S.W.2d 564, 566-67 (Tenn. 1998).

The reason for the rule in Tennessee was long ago stated by the supreme court:

> Where it is intended to impeach the witness by proving that he made statements out of court contrary to what he has testified in court, the witness should be asked whether he said or declared that which it is proposed to prove by the impeaching witness, that he did say or declare, and the time and place and person to whom the declaration was made should also be stated in the question: 1 Gr. Ev., sec. 462 and note 1; Starkie on Ev., marg. p. 239-40 and notes; 2 Swan, 259.
>
> The object of the question is to contradict him, and it is but fair to the witness to refresh his recollection as to the declaration or words used and proposed to be proved, and also by stating time, place and other circumstances calculated to refresh his memory.
>
> If the time, place and person to whom the declaration was made is stated, and also the words or their substance, or the declaration is stated in the question, and the witness answers that he does not recollect, evidence may be given on the other side to prove that the witness did say what is imputed to him, otherwise you never could

contradict a witness who said he could not remember: Shar. Tr. on Ev., m. p. 241, and note K.

*Cole v. State*, 65 Tenn. 239, 241 (Tenn. 1873).

In *State v. Martin*, the Supreme Court of Tennessee acknowledged the ambiguity created primarily by the advisory comments to Federal Rule of Evidence 613(b) and wisely reaffirmed Tennessee's common law commitment to *Queen Caroline's* case. Said the court:

> We further believe it illogical to allow admission of the extrinsic evidence prior to the witness' admission or denial. Confronting a witness prior to the introduction of extrinsic evidence provides for an orderly presentation of evidence and testimony. Time is saved if the witness unequivocally admits to having made the prior statement. Moreover, confronting a witness with an inconsistency prior to the introduction of the extrinsic evidence lessens the risk that a jury will consider the evidence as substantive evidence. We, therefore, hold that extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement. *See State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996) (holding extrinsic evidence admissible when witness denies or does not recall making prior inconsistent statement).
>
> We note that Rule 613(b) of the Federal Rules of Evidence is identical to Rule 613(b) of the Tennessee Rules of Evidence. The federal advisory comments, however, state that a foundation may either be laid before or after an offer of the extrinsic evidence. While there exists a split of authority as to the timing of the foundation, several circuits have clearly expressed a preference for the traditional approach in light of the difficulties the change has caused. *See U.S. v. Bonnett*, 877 F.2d 1450, 1462 (10th Cir.1989) (preferring traditional approach so trier of fact can "observe [witness] demeanor and the nature of his testimony as he denies or explains his prior testimony.") *Wammock v. Celotex*, 793 F.2d 1518 (11th Cir.1986) (holding "[r]ule 613(b) does not supplant the traditional method of confronting a witness with his inconsistent statement prior to its introduction."); *U.S. v. McGuire*, 744 F.2d 1197, 1204 (6th Cir.1984) (stating "[w]e do not approve of the government's not informing the defendant of this evidence, which we view as a questionable trial tactic."); *U.S. v. Barrett*, 539 F.2d 244, 254 (1st Cir.1976) (noting traditional foundational good practice though not required).
>
> While Tenn. R. Evid., Rule 613(b) substantially maintains former Tennessee procedure, the rule also ameliorates the harsh effect of strictly applying the rule in Queen's case. Rule 613(b) permits the trial court to depart from the foundational requirements when "the interests of justice otherwise require." Tenn. R. Evid., Rule 613(b). This clause provides flexibility to deal with the extraordinary case in which the strict application of the rule in Queen's case would lead to injustice. *See* Saltzburg, *Federal Rules of Evidence Manual*, 6th Ed., Vol. 2 (1994) (noting that the strict application of the common law rule resulted in prohibiting extrinsic evidence

> when inconsistent statements were discovered after a witness testified and in prematurely alerting collusive witnesses to evidence available for impeachment).
>
> The case now before us is not the extraordinary case. The state was aware of Ms. Berry's prior inconsistent statement and had ample opportunity to lay a foundation before it attempted to admit the extrinsic evidence. The state, however, never asked Ms. Berry whether she had made a prior statement to the defendant or to anyone else that she did not know the defendant's whereabouts at the time of the robbery. Accordingly, Ms. Berry was not provided an opportunity to admit or deny her pre-trial statement to the defendant. Officer Covington's testimony, therefore, was erroneously admitted.

*State v. Martin*, 964 S.W.2d 564, 567-68 (Tenn. 1998).

Like the State in *Martin*, both counsel for the plaintiff and Joyce Burkhalter were aware at the time of Mrs. Wayne's deposition of the alleged prior inconsistent statement by Mrs. Wayne and had ample opportunity to lay the proper *Queen Caroline* foundation before attempting to admit Mrs. Burkhalter's extrinsic evidence. The question therefore turns on whether Tennessee Rule of Evidence 806 compels the conclusion that Mrs. Burkhalter's extraneous evidence of a prior inconsistent statement by Mrs. Wayne is admissible under the facts of this case wherein she and counsel for the plaintiff knew, at the time of the deposition of Mrs. Wayne, that it was being taken as evidence in case of her unavailability at trial by reason of physical weakness and further knew that the alleged inconsistent statement was one made prior to the deposition, rather than subsequent thereto.

Thus, it is not Tennessee Rule of Evidence 613(b) put to rest by the supreme court's strong reaffirmation of *Queen Caroline's* case in *Martin*, but the Tennessee Rule of Evidence 806 addition to the law that must now be addressed.

Prior to the adoption of the Federal Rules of Evidence which included Rule 806 and the later adoption of the Tennessee Rules of Evidence containing the same language as the Federal Rule, the rebuttal testimony of Joyce Burkhalter would clearly have been inadmissible. In *Metcalf v. New York, Chicago & St. Louis Railroad Co.*, 315 F.2d 318 (6th Cir. 1963), the defendants appealed an adverse judgment assigning as error that the trial court improperly excluded evidence of a prior inconsistent statement impeaching a non-party witness who had testified in the case by deposition. In a per curiam opinion, the Sixth Circuit Court of Appeals adopted the memorandum of the trial judge on this issue stating:

> Extensive research has led to the discovery of only two cases which may be said to be 'on all fours' with the present situation, and curiously enough they both occurred in this circuit. The holding in each of the cases is that where a party has in his possession at the time of the taking of the deposition of a witness for the opposing side a prior contradictory statement, the statement must be introduced at that time for the purpose of impeachment. There is no error in the exclusion of such a statement

on trial when the witness testifies by deposition. *R. B. Tyler Co. v. Greenup*, 140 F.2d 896 (6 Cir. 1944); *Baltimore & Ohio Railroad Co. v. Darling*, 3 F.2d 987 (6 Cir. 1925). The available law thus seems clear that no error was committed in the exclusion of evidence.

*Metcalf v. New York, Chicago & St. Louis R.R. Co.*, 315 F.2d 318, 319 (6th Cir. 1963).

This same rule had been applied by the Sixth Circuit on appeal from the District Court of Tennessee in *R. B. Tyler Co. v. Greenup*, 140 F.2d 896 (6th Cir. 1944).

*Queen Caroline's* foundational rule was so deeply imbedded in the common law of Tennessee prior to the adoption of the Tennessee Rules of Evidence that it is correct to say that if Rule 806 of the Tennessee Rules of Evidence is to be applied to a deposition taken for proof in a case, the result is a profound change in the common law. *See James v. State*, 506 S.W.2d 797 (Tenn. Crim. App. 1973).

The arguments for and against dispensing with the foundational requirements of *Queen Caroline's* case in depositions taken for proof are set forth by Professor Wigmore in his Treatise on Evidence.

> The argument in favor of dispensing with the preliminary question is that, as the impeacher usually cannot know precisely what answers the deponent will give, he cannot be prepared at the time of the deposition to inquire as to the contradictory statements, and he will therefore be cut off absolutely and unconditionally from any sort of impeachment by self-contradiction, unless the present rule is dispensed with:
>
> . . . .
>
> The answer offered to this argument is (1) that practically the opponent does know beforehand, in the ordinary instance, what any important witness is expected to testify to, and he is therefore sufficiently able to learn in advance about self-contradictions, and (2) that, even conceding that an inconvenience may occur, yet this is far outbalanced by the abuses which would be possible if alleged self-contradictions could be brought into court at a time when no adequate opportunity remains for denial or contradiction; . . . .
>
> . . . .
>
> It is hard to choose between these opposing considerations. The truth seems to be that either rule, if inflexible, will occasionally work hardship. It is best to take the middle path, and leave the matter to the determination of the trial court, based on the needs of each case. But it is not to be wondered that the authorities are divided.

John Henry Wigmore, Wigmore on Evidence, Vol. 3A § 1031, pp. 1033-1036 (Chadbourn rev. 1970) (footnotes omitted).

Wigmore quotes at length from a Virginia case which clearly sets forth the reasons for retaining *Queen Carline's* foundational rules as to evidentiary depositions.

> DANIEL, J., in *Unis v. Charlton's Administrator*, 12 Gratt. 484, 495 (Va. 1855); The principal reason assigned by the learned judge who delivered the opinion of the Court [in Downer v. Dana, *supra*] for refusing to apply the rule to depositions is that such a practice would impose on a party wishing the privilege of impeachment the necessity of attending in person or by attorney at the taking of every deposition to be used against him within or without the State, which on any other account he might not be disposed to do. This argument "ab inconvenienti" is not wholly without show of reason when urged in behalf of the exercise of the privilege of impeachment by a party who has had no notice of the taking, or who, though notified, did not attend at the taking of a deposition which he seeks to discredit, but seems to me devoid of weight when extended to the case of a party who was present at the taking of the deposition, and had thus the same opportunity of cross-examining the witness and calling his attention to the imputed inconsistent statements that he would or might have had in case the witness had been examined in court. . . . The rule proceeds from a sense of justice to the witness; . . . these reasons, it is obvious, apply just as forcibly to depositions as to oral examinations in court. And indeed there are considerations which urge the application of the rule to the case of an impeachment of a witness who has given his testimony in the form of a deposition, which may not arise in an effort to discredit a witness who has been examined in court. In the latter case the witness usually remains in or about the court till the trial is concluded; and if an assault is made upon him by proof of inconsistent statements, he might, even before the adoption of the rule requiring him to be first examined as to such statements, be recalled and re-examined by the party in whose favor he had testified; and he may thus have an opportunity of repelling or explaining away the force of the assault; whereas the witness whose deposition has been taken is usually absent from the scene of the trial, and has no shield against attacks on his veracity other than that provided by the rule. . . . There are no peculiar considerations calling upon us to exempt this case from the operation of the rule; for it appears from the deposition that the plaintiff's counsel was not only present at the taking, but exercised on the occasion his privilege of cross-examining the witness.

*Id.* pp. 1034-1035.

It is difficult to imagine a factual situation more consistent with these sound principles than the case at bar. Plaintiffs knew that Mrs. Wayne was in ill health and agreed to take the deposition for evidence. The rebuttal witness-party, Joyce Burkhalter, was present throughout the entire deposition. Counsel for the plaintiffs cross-examined Mrs. Wayne at length at the taking of the deposition on August 19, 1997, and Mrs. Burkhalter, proposing to testify under Tennessee Rule of Evidence 806 was, at the time of the deposition, fully aware of any alleged contradictory statements made by Mrs. Wayne to her on December 8, 1996.

-33-

We now come to the legislative history of Federal Rule of Evidence 806 where we take note of the advisory committee's remarks.

Said the advisory committee:

> When the impeaching statement was made *prior* to the hearsay statement, differences in the kinds of hearsay appear which arguably may justify differences in treatment. If the hearsay consisted of a simple statement by the witness, e.g., a dying declaration or a declaration against interest, the feasibility of affording him an opportunity to deny or explain encounters the same practical impossibility as where the statement is a subsequent one, just discussed, although here the impossibility arises from the total absence of anything resembling a hearing at which the matter could be put to him. The courts by a large majority have ruled in favor of allowing the statement to be used under these circumstances. McCormick § 37, p. 69; 3 Wigmore § 1033. If, however, the hearsay consists of former testimony or a deposition, the possibility of calling the prior statement to the attention of the witness or deponent is not ruled out, since the opportunity to cross-examine was available. It might thus be concluded that with former testimony or depositions the conventional foundation should be insisted upon. Most of the cases involve depositions, and Wigmore describes them as divided. 3 Wigmore § 1031. Deposition procedures at best are cumbersome and expensive, and to require the laying of the foundation may impose an undue burden. Under the federal practice, there is no way of knowing with certainty at the time of taking a deposition whether it is merely for discovery or will ultimately end up in evidence. With respect to both former testimony and depositions the possibility exists that knowledge of the statement might not be acquired until after the time of the cross-examination. Moreover, the expanded admissibility of former testimony and depositions under Rule 804(b)(1) calls for a correspondingly expanded approach to impeachment. The rule dispenses with the requirement in all hearsay situations, which is readily administered and best calculated to lead to fair results.

Thus, the federal advisory committee justifies an all inclusive application of Rule 806 by asserting possibilities which are totally refuted under the facts of this case. There was nothing cumbersome or expensive about laying the *Queen Caroline's* foundation at Mrs. Wayne's deposition and such would certainly impose no undue burden. All parties agreed that the deposition of Mrs. Wayne was being taken for evidentiary use at the trial and not merely for discovery and there was no possibility that knowledge of the alleged prior inconsistent statement occurred subsequent to the deposition cross-examination.

Just as the federal advisory comments led to the split of authority as to the timing of a *Queen Caroline* case foundation and the Tennessee Supreme Court in *State v. Martin*, 954 S.W.2d 564 (Tenn. 1998) disavowed the federal advisory comments in favor of the advisory commission comments to Tennessee Rule of Evidence 613, so the expansive comments of the Federal Advisory

Committee relative to Federal Rule of Evidence 806 are not persuasive, particularly when the facts of this case allay every fear asserted in the federal comments.

Considered in isolation, Tennessee Rule of Evidence 806 allows for the trial tactic of the plaintiff in this case in withholding the prior inconsistent statement at deposition time and then striking with it later at the most advantageous moment. One cannot fault the trial tactic but we do not construe Tennessee Rule of Evidence 806 in isolation. The deposition of Ms. Wayne was clearly admissible under Tenn. R. Civ. P. 32.01(3) because she was unavailable to testify at trial. In fact, it was taken in contemplation of her unavailability at trial. In addition, Tennessee Rule of Evidence 804(b)(1) provides: "Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination."

Plaintiff had ample opportunity in such cross-examination to confront Ms. Wayne with the alleged conversation of November 8, 1996 with the plaintiff, Joyce Burkhalter. If Mrs. Wayne had admitted the particulars of the alleged November 8, 1996 conversation, the extrinsic evidence thereof offered by Mrs. Burkhalter would have been rendered moot. If Mrs. Wayne denied the conversation and the alleged content thereof, the rebuttal testimony of Mrs. Burkhalter would have been admissible just as it would have been admissible had Mrs. Wayne testified that she had no recollection of the conversation.

In the final analysis, all parties agreed to take the deposition of Joyce Wayne for evidentiary purposes on August 19, 1997 because she was suffering from Parkinson's disease and hypertension and might not be available to testify as a witness at the trial. Plaintiff and rebuttal witness, Joyce Burkhalter, sat silently through the entire deposition including extensive cross-examination by counsel for the plaintiff. The prior inconsistent statement or statements that were the subject of her rebuttal testimony on January 14, 1999 had occurred on November 8, 1996, nine months before the evidentiary deposition of Joyce Wayne. Counsel for the plaintiff not only had ample opportunity to cross-examine Mrs. Wayne at the deposition but in fact cross-examined her in depth without ever mentioning the alleged November 8, 1996 inconsistent statements. The reasons for taking the deposition of Mrs. Wayne as an evidentiary instead of a discovery deposition came to pass in the seventeen months between the deposition and the trial of the case in January 1999. Defendants subpoenaed Joyce Wayne as a witness, but because of her physical condition, as attested by her doctor, the trial judge quashed the subpoena. As the last witness to testify before the advisory jury and the court, the plaintiffs offered Joyce Burkhalter to testify to the alleged events of November 8, 1996. The trial judge, considering in isolation Tennessee Rule of Evidence 806, allowed the rebuttal testimony. Then, for the first time, Joyce Burkhalter testified to the alleged events of November 8, 1996. The very physical conditions that prohibited Joyce Wayne from testifying in chief at the trial prohibited her from having any chance to admit, deny or otherwise explain the testimony of Joyce Burkhalter.

In the particular chronology of this case, the pre-Rule 806 exclusion of this kind of rebuttal evidence articulated by *Metcalf v. New York, Chicago & St. Louis Railroad Company*, cries out for survival. Like the other rules of evidence, Rule 806 is subject to Tennessee Rule of Evidence 403 analysis. *See U.S. v. Friedman*, 854 F.2d 535 (2nd Cir. 1988) and under such an analysis given the chronology of the evidence and the alternative means available[2] to the plaintiff to present the alleged contradictory statement of Mrs. Wayne, the danger of undue prejudice to the defendant caused by the manner in which Mrs. Burkhalter's rebuttal testimony was presented, militates against its admissibility and the trial court erred in admitting her rebuttal testimony.

CONCLUSION

This is a troublesome but well tried case. The "clear, cogent and convincing" evidence standard is applicable, requiring the plaintiffs to prove that it is "highly probable" that the two deeds in issue are forged instruments. We have meticulously reviewed the record in the case. We have concluded that the plaintiffs have failed to carry their burden of proof and the judgment of the trial court is reversed and the case dismissed. Costs on appeal are assessed to the appellees and the case is remanded for such further proceedings as may be necessary.

_____
WILLIAM B. CAIN, JUDGE

---

[2] The U.S. Supreme Court has said: "Rather, a reading of the companions to Rule 403, and the commentaries that went with them to Congress, makes it clear that what counts as the Rule 403 'probative value' of an item of evidence as distinct from its Rule 401 "relevance," may be calculated by comparing evidentiary alternatives. . . . The notes to Rule 403 then take up the point by stating that when a court considers 'whether to exclude on grounds of unfair prejudice,' the 'availability of other means of proof may . . . be an appropriate factor.' " *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 652, 136 L.Ed.2d 574 (1997).