IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2019 Session

## MOHAMMAD NASER CHORAZGHIAZAD v. MOHAMMAD CHORAZGHIAZAD

**Appeal from the Chancery Court for Wilson County**
**No. 2016CV276    Charles K. Smith, Chancellor**

_____

### No. M2018-01579-COA-R3-CV

_____

This appeal concerns whether a quitclaim deed was forged.  Mohammad Naser Chorazghiazad ("Plaintiff") sued Mohammad Chorazghiazad ("Defendant") in the Chancery Court for Wilson County ("the Trial Court") alleging that Defendant took certain of Plaintiff's properties by means of a forged deed ("the Quitclaim Deed").  The Trial Court found by clear and convincing evidence that Defendant had indeed forged the Quitclaim Deed to give himself three additional properties that Plaintiff never agreed to transfer.  Defendant appeals to this Court, arguing among other things that the evidence did not rise to the level of clear and convincing necessary to prove forgery.  Given the testimony and evidence including the attendant circumstances surrounding the drafting and signing of the Quitclaim Deed, as well as the Trial Court's credibility determinations, we find, as did the Trial Court, that Plaintiff met his burden of proving forgery by clear and convincing evidence.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Angello L. Huong, Lebanon, Tennessee, for the appellant, Mohammad Chorazghiazad.

Erin Alexander White and Dan R. Alexander, Nashville, Tennessee, for the appellee, Mohammad Naser Chorazghiazad.

# OPINION

## Background

The parties, who are relatives, are embroiled in litigation over the transfer—or non-transfer—of certain properties. In 1993, Defendant bought the three disputed properties at auction. Defendant at that time put these properties in Plaintiff's name. Plaintiff purportedly later paid Defendant $46,000 for the properties and paid property taxes on them for years, as well.

Years later, Defendant wanted the three properties. In March 2016, Defendant drafted the Quitclaim Deed. The Quitclaim Deed had no page numbers and the signature page had no reference to any properties being conveyed. The property descriptions were contained in the body of the deed. According to Defendant, Plaintiff agreed to transfer seven properties to him, including the three disputed properties. Plaintiff's position is that only four properties were agreed upon and that Defendant subsequently altered the Quitclaim Deed to include the three disputed properties.

In July 2016, Plaintiff sued Defendant to void transfer of the three properties. Plaintiff alleged forgery, fraud, misrepresentation, and breach of contract among other claims. This case was tried in May 2018.

At trial, Plaintiff testified to the transaction at issue:

Q. So, let's flash forward to March 2016.
A. Yes.
Q. Did you get a call from the Defendant?
A. Yes.
Q. Tell me about that.
A. He called me to meet me in UPS Office on Thompson Lane, and I did.
Q. Did he tell you why he wanted to meet you?
A. He wanted to have those four properties back under his own name, Defendant name.
Q. So, what happened? Did you go to the -
A. Yes, I did. I met him over there and -
Q. Tell me about the Quitclaim Deed that the Defendant presented to you.
A. Yeah, he gave me this Quitclaim Deed for property, Tract One, Two, Three, Four was in that deed. I read and everything was normal and I signed the Quitclaim Deed.
Q. Were the three properties in dispute in this case in the Quitclaim Deed that you signed in March of 2016?

A. No, it wasn't.

Q. Did the Defendant pay any consideration, any money of any kind, for that Quitclaim Deed that you signed?

A. No.

Q. So, you signed this Quitclaim Deed conveying Tracts One, Two, Three and Four.

A. Yes.

Q. Was there a Notary there?

A. Yes.

Q. Did the Notary acknowledge your signature?

A. Yes.

Q. What happened next?

A. He say goodbye and he left.

Q. Who had the Quitclaim Deed?

A. He did.

Q. Who was supposed to record it?

A. Defendant.

Q. Did you get a copy?

A. No, he didn't give me a copy.

Q. Is that your signature on the back of that Quitclaim Deed?

A. Yes, it is.

Q. The Quitclaim Deed in dispute, is it your signature on that last page of the Quitclaim Deed in dispute?

A. Yes, it is.

Q. But you did not sign a Quitclaim Deed for the three properties in dispute?

A. No, I did not.

Q. Did the Defendant tell you who typed up that Quitclaim Deed that's in dispute?

A. He said he did his self.

Q. I believe you have a copy of the Quitclaim Deed that's at issue, dated March 23; could you turn to that?

A. Yes.

Q. This Quitclaim Deed that's at issue, are there any page numbers on this Quitclaim Deed?

A. No.

Q. Other than the recording?

A. No, there is no page number.

Q. Turn to the last page that has your signature.

A. Okay.

Q. Is there any reference to what properties are conveyed?

A. No.

Q. Is there any reference to how many pages the Quitclaim Deed is comprised of?

A. No.

Q. This Quitclaim Deed that's in dispute, turn to that first page of that Quitclaim Deed at issue. Does it say that anything was paid in consideration?

A. The first line it says sum of a dollar, yes, cash.

Q. But were you paid a dollar?

A. No.

Plaintiff also testified that Defendant had threatened and cursed him at a deposition. Proceeding with our review of the pertinent testimony, Plaintiff's wife Maryam Sangchap took the stand and testified to a contentious telephone conversation she had with Defendant in April following execution of the Quitclaim Deed:

THE WITNESS: When he calling me he just started to talk like 10, 15 minutes, talking behind my husband and my husband's family, and as he talked more his voice just got little more angry. First he was calm but after that his voice just got little angry and that time he said, "I'm angry at Naser." And I said, "Why? He didn't do anything wrong." And he said, "No, I wanted three lands and he doesn't want to sell it to me." And I said, "But that was agreement between you and Naser to sell just one land." At that time he said, "Tell Naser I took three lands."

Defendant, in his first of two appearances testifying at trial, denied threatening anyone. Defendant testified, in part:

Q. And is it also your testimony that you've never - have you ever, and again, I think you may have already testified to this, but have you ever been in trouble with the IRS for not paying tax?

A. No.

***

Q. Were you in the courtroom when the Plaintiff testified that you threatened him?

A. I didn't threaten him, no.

Q. So, it's your testimony that you did not say, you know, "F . . . you, I'm going to take care of you."

A. No, that's ridiculous. I'm 59 years old; I don't talk like this.

Q. Have you ever threatened anyone that you had business transactions with, whether it was property or any other kind of transactions -
A. Don't remember.
Q. - have you made threats to other people who you've had business transactions with?
A. Can you specify who?
Q. Anyone.
A. No.

Following Defendant's denials of threats and other misbehavior, Plaintiff called Shawn Touloeisani ("Touloeisani"), an acquaintance of Defendant's, to testify to Defendant's untruthful character:

Q. Could you please state your name for the record?
A. Shawn Touloeisani.
Q. And do you know the Defendant and the Plaintiff?
A. Yes.
Q. Are you related to either party?
A. No.
Q. How long have you known the Defendant?
A. I would say 36, 37, 38 years old.
Q. And do you have an opinion as to the Defendant's character for truthfulness and veracity?
MR. HUONG: Objection. He can state specific acts but opinion as to character is too general.
MS. WHITE: 608(a), I believe --
THE COURT: Let me look at 608(a).
MS. WHITE: 608(a), Opinion and Reputation.
THE COURT: Let me see. I'll overrule the objection. It can be entered subject to these limitations: The evidence may refer only to character for truthfulness or untruthfulness; and No. 2, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked. Now, has his character been attacked?
MS. WHITE: It has. I think I impeached him on the stand.
THE COURT: I find that you have done that and I will let you ask him only to his character for truthfulness.
MS. WHITE: Thank you.
BY MS. WHITE:
Q. MR. Touloeisani, do you have an opinion as to the Defendant's character for truthfulness?
A. Yes.

Q. And what is that opinion?

A. It's not good at all.

Q. Tell me what it is.

A. He does lie, he does deceive people.

Q. Do you recall a business transaction on a loan that you had with the Defendant in 2013?

A. Yes.

Q. Could you tell me about that?

A. The Defendant, I had a post-dated check from him -

Q. Let me stop you there. Did you loan him money?

A. It was insurance money and that was a real estate deal which, basically, was under his name but at the same time it was in my name and it was insurance money.

Q. Did you loan him money for insurance?

A. Yes.

Q. And tell me more.

A. He wrote me a check. He post-dated it and then -

Q. Was this check to reimburse you for the money that you'd lent him?

A. Yes. And several weeks later he came back. He said - he came to my office and he asked if I can take the - give him the post-dated check since he has changed his bank account. He wanted to just present me with a new check.

Q. What happened next?

A. I gave him the check and he tore the check in front -

Q. You gave him the post-dated check that he had written you?

A. Yes, yes. I gave him the post-dated check and he tore up the check in front of my face and start threatening me.

Q. When you say he started threatening you, what did he say, specifically?

A. Foul language, I mean that's something that's -- that's his personality. I'm sorry if I'm just going over things. Profound language and threaten me with my business.

Q. He threatened you what now?

A. With my business.

Q. With your business.

A. Yes.

Q. So, tell me -

A. He said, "I will give you so many different problems."

Q. He said he was going to give you so many different problems.

A. Because I do have a business that is a manufacturing facility -

Q. Do you own that business?

A. Yes.

-6-

Q. So, what does your business do?

A. I'm a manufacturer; I have been for past 30 years.

Q. Do you have employees?

A. At this point of time I have seven employees but at the time, back in 2006, 2005-2006, I had over 120 employees.

Q. So, you said that he threatened you with your business, what did he say specifically?

A. He said that I would give you problem through Metro Codes because your building is out of - is in violations for certain things. I don't know. He comes up with words, he comes up - he loves to manipulate people. He loves to lie; he loves to just get in everyone's business. And that's what he tried to tell me. And that same time -- I can just want for your next question or I can just continue, Your Honor. I'm not sure.

Q. Well, so he came to your business.

A. Yes.

Q. He tore up that post-dated check that he wrote you?

A. That's correct.

Q. Did he ever pay you back?

A. No.

Q. Do you know why he was threatening you with your business?

A. Because we had a previous dispute; we had a case in the court and somehow we settled it, everything was done, and I thought everything was fine. He agreed to it; I agreed to it; everyone agreed to it. This man probably lose $10, $20, but Shawn, due to the Bankruptcy of one of my biggest customer, I lost $1.2 million. And I could not -

MR. HUONG: Objection, speculation.

BY MS. WHITE:

Q. Well, let's move on.

A. Okay.

Q. In 2007, did the Defendant come to you about a Deed?

A. Yes.

Q. Tell me about that.

A. It was Defendant and Mr. Azad. They both came to my office and seems like they had problems within themselves. And the Defendant asked me at that time would I be willing to put two of his properties into my name.

Q. Did he tell you why?

A. He has problems - well, that's not something new for him -

Q. Did he tell you why?

A. Yes.

Q. What was the reason?

A. Problems with bill collectors and IRS.

Defendant, returning to the stand in the defense portion of trial, testified in part as follows:

Q. And tell me, you are the one that drew up the Deed, correct?
A. Yes.
Q. And also tell me, on that Deed you drew up were all seven tracts listed?
A. Yes, it was.
Q. It wasn't just four tracts?
A. No, it was seven.
Q. And you can guarantee that it was all seven tracts listed?
A. Yes.
Q. And you said how many copies did you bring?
A. Three.
Q. And so why did you bring three copies, what was the purpose?
A. Give him one and in case we mess up one we have one extra.
Q. Okay, so you showed the Deed papers to him, right?
A. Yes.
Q. How long did it take him to read through or review it?
A. He just look at it for a few seconds or so.
Q. Really? Okay, not that long?
A. Not that long.
Q. Was the Notary present while you were looking at them or did you -
A. No, he look at it before Notary come to us for Notary Public or so, to notarize it.
Q. And then he signed the Deed, correct?
A. Yes.
Q. Did you give him a copy?
A. Yes, I did.
Q. So, the thing about him not receiving the copy, what do you think about his testimony that he didn't receive a copy?
A. I don't know. I believe he's lying.
Q. And then after that you left the UPS Store?
A. Yes.
Q. When was the next contact you had with Plaintiff or any of his family after that?
A. When I went - I went and registered that morning and I called and talked to him -
Q. When you say registered, and I know your English isn't fluent so I want to clear this up, are you talking about the day you recorded the Deed?

A. Yes.

Q. And I believe that day was March 23?

A. Okay.

Q. You go ahead.

A. March 23, 2016. And I went and registered that morning and I just call, talk to him in the afternoon, and his wife picks up the phone and she was talking about her mom passed away, her dad passed away, and talking about this and that or so. Anyway, subject came up about property. I told her, if you talk to my cousin, tell him thanks, I have registered all the property. That was end of it. Then he calls back and he said, "Why did you register?" I said, "What do you think I got your signature for? To go register all this property." And that was end of it. And before I know, I had a summon to go to the court for those three property or so.

Q. Was there any yelling and screaming [and] cussing during that conversation?

A. No, it wasn't. It was asking me why I had registered it. I said, "Well, why do you think I notarize it for? I had to go register it."

Q. And did you have any further telephone conversations with them after that?

A. After that I try calling but his phone was blocked, his son phone was blocked, and I couldn't get in touch with him, talk to him, see what he was fussing about, what his problem is.

Q. So, did you ever tell the Plaintiff's wife that you wanted those tracts?

A. No. Number one, he never discuss his business with his wife. She's been here 15 years and on her deposition she said I called her, I told her I'm going to put you in jail, put your family in jail. She's been here 15 years; it's not that easy put anybody in jail.

Q. Let me go a little bit further back. During the years that Plaintiff has had the property in his name, did you ever pay him for the property taxes on those?

A. Yes, I have. I paid him cash. Only why he was paying the property tax because he was filing with his taxes and stuff, return taxes stuff and he could get some money for the --

Q. Deducting -

A. Deductible, yes.

Q. And did he contact you, requesting that you reimburse him for property taxes?

A. Yes, every time he paid I paid him cash.

In August 2018, the Trial Court entered its final order. The Trial Court found in favor of Plaintiff and rescinded the Quitclaim Deed for fraud as to the three disputed properties. In its oral ruling attached to its final order, the Trial Court stated:

It's the finding of the Court that in this -- this was a matter regarding the purchase or non-purchase of three tracts of property. It's the plaintiff basically alleging that he purchased three tracts from the defendant; the defendant says he did not. And it's also an issue of whether or not -- the main issue here is whether the defendant forged or altered a deed from -- after it was signed or executed by the plaintiff, but before it was filed. That's seemingly the real issue here.

I started my finding out with credibility. And I find that the defendant is not credible and that he cannot be believed under oath. I find plaintiff and plaintiff's witnesses credible and can be believed under oath.

This is a case regarding a quitclaim deed from plaintiff to defendant on March 12, 2016. It is plaintiff's position that the defendant altered the deed after execution and before the defendant recorded the quitclaim deed by adding three tracts of land owned by plaintiff identified as Tract 5, Tract 6, and Tract 7.

It is defendant's position that he did not alter the quitclaim deed, that Tract 5, Tract 6, and Tract 7 was on the quitclaim deed when plaintiff executed it.

Plaintiff has asked this Court to rescind the March 12, 2016 quitclaim deed as to the three properties in dispute for fraud and for his failure to meet the elements of a contract.

Again, it is the opinion of this Court that the defendant was not a credible witness who could be believed under oath; I therefore reject all of his testimony.

It's the opinion of this Court the defendant has no respect for honesty and truthfulness, nor of the law of this land. The defendant thinks it's okay to lie, cheat, or steal as long as it benefits himself, as is evidenced by the following.

In 2007, defendant claims he purchased the . . . property and placed it in the name of Shawn T-O-U-L-O-E-I-S-A-N-I for convenience. Shawn -- I'll refer to him as Shawn without spelling his name every time.

Shawn testified that defendant told him the reason defendant needed to put it in his name was because defendant was having problems with bill collectors and IRS. Shawn also testified that defendant's character for truthfulness was not good; he does lie; he does deceive people.

December the 27th, 2012, defendant allegedly conveyed his residence . . . to his brother in Iran for whom he allegedly has a power of

-10-

attorney. The power of attorney was never shown to the Court, and there's a question of whether he even really does have a brother that lives in Iran. There was a lot of dealing going on that did not make a great deal of sense to the Court except if defendant was trying to conceal ownership of this property so that creditors and IRS could not get to it.

Defendant, even though he sold his property allegedly to his brother in December 27, 2012, defendant continued to reside in the property and still does until today. The property was conveyed to the plaintiff on August 13, 2013. The defendant signed his brother's name executing the quitclaim deed. The defendant said he was actually transferring the property, not his brother.

So he's showing intent that his brother, it's the opinion of this Court, his brother never really owned this property . . . was just hiding it in someone else's name making it more difficult for creditors or IRS to find it.

He testified in court he transferred the property to plaintiff because it was convenient. However, he testified at deposition he conveyed the property in plaintiff's name for security purposes in case he got sued.

Defendant continued to reside in this property and still does even though he conveyed it to his brother and then allegedly his brother, by way of power of attorney held in defendant's name, conveyed it to plaintiff.

And this is not the property at issue here, but it's just a showing of the dealing and wheeling -- wheeling and dealing the defendant was doing, and the dishonest actions of him in doing this to -- it was to his convenience all right so that it would be hidden from any creditors or IRS.

Even though the defendant denies ever having a tax lien on his property, this is not true as is evidenced by the notice of federal tax lien filed as Exhibit 8 to the trial testimony. Notice of tax lien for the period ending 12/31/02 shows defendant owed $59,199.63 for 1040 taxes recorded in register of deeds book for Wilson county, 4/18/11 -- Davidson county, not Wilson County. Register of deeds office in Davidson County, 4/18/11.

There's also a notice of federal tax lien for tax periods ending 3/31/89, 6/30/89, 9/30/89, and 12/31/89 showing defendant owed 941 taxes as recorded in register of Wilson -- register of deeds for Wilson County, 4/17/2000.

These are just -- it is evident that defendant was placing his property in the name of others in order to prevent a tax lien being placed on his property which is an act of deceitful -- acts of a deceitful, dishonest man. He not only attempted to not pay his taxes, but concealed his property so that the taxes could not be collected.

In 1993, property owned by the defendant was foreclosed on by a lending institute. This is a property at issue here. Defendant owned some

property and borrowed money on it through a bank. And, in 1993, this property owned by the defendant was foreclosed on by a lending institute. Three properties at issue were sold.

It is the opinion of this Court the defendant, pretending to be the plaintiff, purchased the three tracts in the name of the plaintiff as is evidenced by the substitute trustee deed filed as Exhibit No. 2.

The facts are the defendant owned these three tracts identified as Tract 5, 6, and 7, and failed to make the payments on them for various reasons. The bank foreclosed on him. He would have this Court to believe he went to the foreclosure sale and bought this property himself but just put it in plaintiff's name. That's beyond belief. He went there pretending to be plaintiff, bought the property as plaintiff for a reduced amount.

The bank would not have sold this property to the defendant for a lesser amount. They'd want him to pay the balance off that was owed on the notes and evidenced by a deed of trust with the bank. If the bank would carry on this type of business, everybody would -- anybody that was upside down on a mortgage would just let it go to sale and buy it cheaper and get it back cheaper, you know, and this wouldn't make sense.

And the defendant repeatedly refers -- claims that he put the property up for auction. It wasn't put up for auction, it was foreclosed on.

In court the defendant denies that there were properties -- that these properties were sold because of IRS tax liens he could not pay. However, his testimony was impeached by testimony he was previously given in a deposition.

On the witness stand, the defendant stated under oath on direct examination that the defendant borrowed $20,000 from the plaintiff on December 23rd, 2015, and that the defendant held the money for three or four months, then deposited back to plaintiff's account.

Then later on, in cross-examination, the defendant testified that he borrowed the $20,000 from a financial company to pay the plaintiff back. On direct examination of the defendant by plaintiff's counsel, counsel asked the defendant why he put these three properties in dispute under plaintiff's name at the 1993 auction. Defendant responded that he did it because plaintiff was trying get a loan for the defendant. Later, the defendant testified that the defendant put the properties under plaintiff's name for the plaintiff just to hold for him.

On direct examination the defendant -- next, on the direct examination of the defendant by the plaintiff's counsel, the defendant was asked if he was -- if he's ever threatened anyone with whom he has had business dealings. The defendant first testified, "Don't remember."

Defendant was asked the question again and defendant responded, "Can you specify who?" Counsel responded, "Anyone." Defendant then answered no.

Plaintiff's counsel next called the rebuttal witness, Shawn T, and I've spelled his name above. Mr. T testified that he had a business dealing with defendant and defendant threatened him in his business.

Mr. T testified that he loaned money to the defendant and the defendant wrote Mr. T a postdated check. Later, the defendant showed up at Mr. T's business and told Mr. T that the defendant had opened a new bank account and asked for the postdated check back and defendant would write Mr. T a new check.

Mr. T handed the defendant the check, and the defendant tore the check up in front of Mr. T's face, and then told Mr. T the defendant would give him so many different problems with the business and call Metro codes on him.

Next, Mr. T was also called as a witness after defendant was impeached on the stand to testify as to defendant's character for truthfulness.

Mr. T testified that he had known the defendant for 36, 38 years, and that he was not related to the defendant or the plaintiff. Mr. T then testified it was his opinion that defendant lies and deceives people.

Next, the defendant, who admitted in testimony that he drafted the March 12, 2016 quitclaim deed, made a sworn oath by affidavit on the quitclaim deed that the properties were conveyed for and consideration of the sum of $1 cash in hand paid by the hereinafter named grantee.

The defendant then stated under oath on the witness stand that he paid nothing for the three properties in dispute.

Also, further evidencing the character of the defendant, at the defendant's deposition on 6/9/17, defendant threatened to "f--- up plaintiff when this was over." This was testified to by the plaintiff and the plaintiff's wife.

Further, the defendant placed electric meters in the name of the plaintiff on his residence and business lot without plaintiff's permission in order to avoid paying a deposit, and just doing whatever feels good to him to avoid financial obligations.

Defendant failed to timely file his income tax returns. The defendant has failed to pay his 941 taxes on his hair salon.

Defendant signed plaintiff's name on a notice. On 8/8/97, defendant signed plaintiff's name on a notice of encroachment with plaintiff's permission -- without plaintiff's permission on 8/8/97 which is Exhibit 11.

On 4/1/16, defendant endorsed plaintiff's name on two checks without plaintiff's permission.

It is the opinion of this court, based upon the evidence presented to this Court, that the testimony of plaintiff and plaintiff's witnesses was credible and believable. It is further the opinion of this court that the plaintiff purchased the property described in Tract 5, 6, and 7 from defendant for $46,000 in 2001 and 2002 which is supported by the check registry evidencing payment of $46,000 -- as plaintiff's check registry evidencing payment of $46,000 to defendant.

Two, plaintiff paid the property taxes on said property from 2001 through 2016.

Three, plaintiff listed the property for sale in 2003 and 2008.

Four, testimony of wife and son of plaintiff that plaintiff had told them he had purchased property from defendant, and the plaintiff's testimony.

It is the opinion of this Court that there was no need for a deed to be executed in 2001 and 2002 since property was already in plaintiff's name by substitute trustee deed dated 6/15/93 identified as Exhibit 2.

It is the opinion of this Court that on March 12, 2016, plaintiff executed a quitclaim deed transferring Tracts 1, Tract 2, Tract 3, and Tract 4 to the defendant.

It's the further opinion of this Court that defendant altered the quitclaim deed after it was executed and before it was recorded by adding Tracts 5, Tract 6, Tract 7.

It is the opinion of this Court that the plaintiff has proven by clear and convincing evidence that defendant paid plaintiff no consideration for Lots 5, 6, and 7, and that defendant fraudulently altered the quitclaim deed of 3/12/2016 by adding Tracts 5, 6, and 7. This is further supported by the testimony of the wife of plaintiff that defendant admitted to her that he took the three tracts of property identified as 5, 6, and 7.

It is therefore ordered by this Court that the 3/12/16 quitclaim deed as to the three properties in dispute be rescinded for fraud and for failure to meet the necessary elements of consideration for a contract to be binding.

Defendant timely appealed to this Court.

## Discussion

Although not stated exactly as such, Defendant raises the following issues on appeal: 1) whether the Trial Court erred in allowing character evidence to be used at trial; 2) whether Plaintiff sustained his burden of proof under the clear and convincing standard

for his claim of forgery of the Quitclaim Deed; and, 3) whether Plaintiff sustained his burden of proof of showing a contract for the purchase of real estate existed.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Our Supreme Court has stated concerning witness credibility determinations:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ─── U.S. ────, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). The burden of proof necessary to establish forgery in order to set aside a written document is that of "clear, cogent and convincing" evidence. *Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 556 (Tenn. Ct. App. 2001).

We first address whether the Trial Court erred in allowing character evidence to be used at trial. Regarding our standard of review as to a trial court's decision on whether to admit or exclude evidence, "[t]he appellate court affords the trial court wide discretion regarding the admissibility of evidence and will not overturn the trial court's determination absent an abuse of that discretion." *Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007). "An abuse of discretion occurs when the trial court

causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). In admitting the evidence at issue, the Trial Court relied upon Tenn. R. Evid. 608, which states, as relevant:

> (a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) the evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

> (b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are . . . .

Plaintiff asserts that Defendant failed to object to the impeachment testimony at trial and should be barred from doing so on appeal. "[I]n order to raise an issue on appeal regarding the admissibility of evidence, the party raising the issue must have made a contemporaneous objection." *McGarity v. Jerrolds*, 429 S.W.3d 562, 567 (Tenn. Ct. App. 2013); *See* Tenn. R. App. P. 36(a). Defendant's counsel, in fact, did not object to testimony about specific acts. Instead he stated "[Touloeisani] can state specific acts but opinion as to character is too general." This is essentially the opposite of Defendant's position on appeal. Defendant thus failed to timely object to the introduction of specific acts. The issue is waived.

Even if the issue were properly before us and we concluded that the Trial Court erred by allowing Touloeisani to testify to the extent he did, that alone would not require reversal. We will not reverse the judgment of a trial court "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment . . . ." Tenn. R. App. P. 36(b). The Trial Court had significant other evidence, the

-16-

admissibility of which is undisputed on appeal, on which to base its decision. If the Trial Court erred, such error was harmless.

We next address whether Plaintiff sustained his burden of proof under the clear and convincing standard for his claim of forgery of the Quitclaim Deed. Plaintiff testified that the Quitclaim Deed, when presented to him, did not contain the three disputed properties. Defendant states that it did. The Trial Court, which had occasion to see and hear the witnesses testify, found Plaintiff and his witnesses credible and Defendant not credible. We defer heavily to such credibility determinations.

In addition, the circumstances surrounding the transaction were highly suspect. The Quitclaim Deed had no page numbers. The signature page had no reference to any properties conveyed. Defendant, who drafted the Quitclaim Deed, left himself the means of inserting the three disputed properties afterward. The Trial Court credited Plaintiff's testimony that he never agreed to transfer the three disputed properties that Plaintiff had purchased from Defendant for $46,000 many years earlier.

Other evidence further undermines the transaction. Maryam Sangchap, Plaintiff's wife, testified to a contentious phone conversation in which Defendant boasted about taking "three lands." The Trial Court was highly skeptical as to Defendant's vacillating testimony and unsatisfactory explanations. All in all, the evidence is of such a sort to eliminate any serious doubt as to what transpired with the Quitclaim Deed. We find, as did the Trial Court, that Plaintiff met his burden of proving forgery by clear and convincing evidence.

The final issue we address is whether Plaintiff sustained his burden of proof of showing a contract for the purchase of real estate existed. This third issue raised by Defendant is somewhat opaque as to its purpose, but we address it as best we can. In his brief, Defendant articulates his reasoning for raising this issue as follows:

> Although Appellant accepts a deed can be set aside by the court on the basis of forgery or alteration, Appellant is at a loss in understanding how, in a theoretical scenario, an otherwise valid Quitclaim Deed (assuming no claims of forgery are asserted by any of the parties) can also be set aside due to lack of consideration for "a contract to be binding"— as stated by the trial court. A Quitclaim Deed by its very nature makes no warranty or assurance as to the owner's rights or title to the property nor does it make any representations as to any liens, encumbrances, or any other defects upon the property. Accordingly, a Quitclaim Deed can be executed with only token or nominal consideration. Insofar as the court's additional determination that the Quitclaim Deed of March 12, 2016 should

also be set aside on the alternative basis of lack of consideration "for a contract to be binding", this particular finding should be set aside or vacated as a matter of law.

Having affirmed the Trial Court in its finding by clear and convincing evidence that the Quitclaim Deed was forged by Defendant as to the disputed properties, we need not decide whether there was sufficient consideration for the Quitclaim Deed. Naturally, a forged deed is unsupported by consideration. Under these circumstances, consideration is an irrelevant factor. We would note, however, that the consideration for these three disputed properties apparently was the exact same as that for the four properties not in dispute. In that respect, this is an odd basis for rescinding the Quitclaim Deed as to the disputed properties. In any event, the Trial Court's alternative finding of a lack of consideration was superfluous. That the Quitclaim Deed was proven by clear and convincing evidence to be forged resolves the case. We affirm the judgment of the Trial Court rescinding the Quitclaim Deed as to the three disputed properties.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Mohammad Chorazghiazad, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE